426 A.2d 1155

**Henry WRECSICS and Mary Wrecsics,**

v.

**Kenneth BROUGHTON and LaVerne Broughton, Appellants.**

Superior Court of Pennsylvania.

Argued June 12, 1980.

Filed March 6, 1981.

Ronald W. Shipman, Easton, for appellants.

Edward G. Ruyak, Bethlehem, for appellee.

Before HESTER, CAVANAUGH and VAN der VOORT, JJ.

HESTER, Judge:

In this child custody dispute, the lower court awarded a 13 year-old girl to the custody of her maternal grandparents, as against the claim of the parents. Because the record is complete and the lower court has filed a comprehensive opinion discussing all issues, we will affirm.

Appellant LaVerne Broughton and one Edward Wanner were married on February 5, 1966 and resided for a short time with Wanner's parents in Hatfield, Pennsylvania. One child resulted from this union: Lisa Ann, born July 10, 1966, the subject of the instant proceeding. The marriage deteriorated within just a few months and Lisa was placed in the care of LaVerne's parents, Henry and Mary Wrecsics, the appellees herein, while LaVerne moved in with a girlfriend. Following a divorce, LaVerne then married one Robert Becker, a police officer, and lived with him in Hatfield. Becker legally adopted Lisa and she resided in the marital home for about a year and a half. Soon, however, this marriage, too, floundered when LaVerne began living with Kenneth Broughton, an appellant herein, her boss at the time. Custody of Lisa was abruptly transferred back to the Wrecsics when, one evening, Becker discovered and photographed his wife in an amorous and compromising position with Broughton. Becker caused to be filed criminal charges of adultery and bigamy against LaVerne and Broughton, as both were married at the time, but agreed to drop the charges if LaVerne would transfer Lisa back to the Wrecsics and straighten out her own marital problems. The Wrecsics also participated in these negotiations. At that time, 1971, Lisa in fact returned to the Wrecsics home, the Beckers were divorced, and LaVerne and Kenneth Broughton were finally married on August 31, 1974. Since 1971, Lisa has never lived in any home other than the Wrecsics', her maternal grandparents.

Over the next few years, appellants LaVerne and Kenneth Broughton lived in a variety of locales near the Wrecsics and would frequently see Lisa on weekends, holidays, and other occasions. With Mr. Becker's consent, Kenneth Broughton adopted Lisa as his daughter, although she continued to reside with her grandparents, now living in Hellertown, Pennsylvania. During this time period, the Broughtons had a little girl of their own, Shelly, born July 3, 1972. The pattern of frequent visitation between Lisa and her parents continued until early in 1977 when the Broughtons moved to

Erie, Pennsylvania, where Kenneth took a managerial position with a manufacturing firm. Lisa visited her parents during the summer of 1977 and they visited her during Thanksgiving of that year at the Wrecsics. At that time, Mr. Broughton, during a family discussion concerning wills, announced that since Lisa was well cared for by the Wrecsics, he would not include her in his will, but would bequeath his entire estate to Shelly.[1] Appellee Mary Wrecsics became quite upset at hearing this and requested the Broughtons to leave. Lisa did not again see her parents until the summer of 1979 when she spent some time with them in Erie. By that time, the instant proceedings for custody had been commenced by the appellees. Hearings were held in the Court of Common Pleas, Northampton County, on September 20 and 21, 1979. Appearing before the court were the Broughtons, the Wrecsics, LaVerne's two former husbands, two neighbors of the Wrecsics, Lisa's school principal, and LaVerne's sister. In addition, the court interviewed Lisa in chambers in the presence of counsel at which time Lisa stated she wished to remain living with her grandparents. On October 15, 1979, the court entered an order establishing custody in the appellee-grandparents with liberal visitation privileges in the parents. The court later filed an opinion in support of the order. This appeal ensued.

■ The Supreme Court has recently restated the standard to be applied in a custody dispute between parents and non-parents:

"'When the judge is hearing a dispute between the parents, or a parent, and a third party, . . . [t]he question still is, what is in the child's best interest? However, the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is

1. Several witnesses, including LaVerne, testified that Kenneth on this occasion stated he would "disown" Lisa. Mr. Broughton vigorously denied making such a statement.

tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's scale.'"

*Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512, 513–14 (1980), quoting *In Re Hernandez*, 249 Pa.Super. 274, 286, 376 A.2d 648, 654 (1977). Thus, the non-parent bears the heavy burdens of production and persuasion. *Hooks*, supra. This standard "seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, other factors which have significant impact on the well-being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit." *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 328, 421 A.2d 157, 161 (1980).

The respective duties of the trial and appellate courts in such cases are also well-settled:

In order to ensure that the best interests of the child will be served, the appellate court will engage in a comprehensive review of the record. *Scarlett v. Scarlett*, 257 Pa.Super. 468, 390 A.2d 1331 (1978); *In Re Custody of Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976). Thus, while it will defer to the lower court's findings of fact, the appellate court will not be bound by the deductions or the inferences made by the lower court from those facts, but will make an independent judgment based upon its own careful review of the evidence. *Sipe v. Shaffer*, supra; *Scarlett v. Scarlett*, supra. In conducting this review, the appellate court will look to whether all the pertinent facts and circumstances of the contesting parties have been fully explored and developed. See *Sipe v. Shaffer*, supra; *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). It is the responsibility of the lower court to make a penetrating and comprehensive inquiry, and if necessary, to develop the record itself. See *Commonwealth ex rel. Cox v. Cox*, 255 Pa.Super. 508, 388 A.2d 1082 (1978).

After fulfilling this responsibility to ensure a complete record, the court must file a comprehensive opinion containing its findings and conclusions. See *Valentino v. Valentino*, 259 Pa.Super. 395, 393 A.2d 885 (1978); *Gunter v. Gunter*, supra. Only with the benefit of a full record and full opinion can the appellate court hope to fulfill its responsibility of conducting its own careful review. *Valentino v. Valentino*, supra. Where the record is incomplete or the opinion of the lower court is inadequate, the case will be remanded. See *Valentino v. Valentino*, supra; *Commonwealth ex rel. Forrester v. Forrester*, 258 Pa.Super. 397, 392 A.2d 852 (1978); *Commonwealth ex rel. Cox v. Cox*, supra.

*Lewis v. Lewis*, 267 Pa.Super. 235, 240, 406 A.2d 781, 783–4 (1979).

■ In the instant case, we find the lower court has complied with these requirements. In reaching its decision, the court placed heavy emphasis on the fact that the appellants have utterly failed over the years to exert themselves to take and maintain a place of importance in Lisa's life and to demonstrate real love, concern, and protection for the child. In support of this conclusion, the record reveals the following:

During all the time LaVerne and Kenneth Broughton have lived together, they have never, until these proceedings began, demanded or requested custody of Lisa. This is true even when Kenneth Broughton adopted Lisa in 1974. Whenever the subject of custody arose, Mrs. Broughton's feeling was always that Lisa should choose to live with whom she wished and that "the door was always open" for her to live with her parents. At first, domestic and financial difficulties may have precluded a change in custody, but at least since 1974 there have been no impediments to Lisa rejoining her parents. They have simply failed to ask for her, leaving her instead in the care of appellees.

Almost all of the visits between Lisa and her parents from 1971 to 1977 occurred when the Wrecsics took Lisa to the Broughton's home and not because the appellants visited

their daughter at the Wrecsics or took her with them. This was true even during one period when the Broughtons lived across the street from the appellees. While living in Erie, the Broughtons never called or wrote to their daughter, never inquired after her welfare or her progress in school. Over the years, the Broughtons have contributed little, if any, financial support to the Wrecsics for the care of Lisa. The Wrecsics have sustained the entire financial burden for the child's upbringing, including doctor visits and medicines necessitated by her allergies and a kidney ailment.

Several witnesses agreed that when Lisa has visited her mother in the past, the normal incident of a mother-daughter relationship were absent—Mrs. Broughton never exhibited affection for the child, refraining from embracing or kissing Lisa. Robert Becker, LaVerne's second husband, stated that when Lisa visited his then-wife, "Lisa always was a burden to LaVerne, a chain around her neck." R.R. 116a. Mrs. Wrecsics and Josephine Zavecz, LaVerne's sister, concurred in this assessment and added that the appellants rarely showed affection for the child.

The lower court concluded that in view of the Broughtons' attitude toward their daughter over the years, i. e., failure to visit or contribute support, failure to inquire as to her well-being, failure to exhibit love and affection for her, failure to initiate contact and make overtures to establish custody and a close relationship with Lisa, that they had "abandoned" their daughter. While we need not decide whether an abandonment has occurred, we do agree that appellants' conduct has greatly diminished the "importance of parenthood as a factor" in deciding this case, *Albright*, and that the "evidentiary scales" are no longer tipped to the parents' side. *Ellerbe.*

The evidence established that the Wrecsics have provided a very suitable home life for Lisa over the years. They occupy a six-room, colonial style house in Hellertown and Lisa has her own bedroom. The Wrecsics are practicing Roman Catholics and take Lisa to church with them each Sunday. Lisa attends St. Theresa Catholic School, as she

has since first grade, and her school principal testified that Lisa is an average, well-disciplined, sensitive child who participates in many school and church activities. Lisa has expressed to her principal an interest in attending one of the two Catholic schools in the area.

Several witnesses attested to the stable, happy home life enjoyed by Lisa with her grandparents. Mary Ann Sheridan, for example, the Wrecsics' landlord, visits their home "just about every day" and characterized Lisa's relationship with her grandparents as "very close." R.R. 200a. A neighbor, Joseph DeMasi and LaVerne's sister Josephine agreed.

Appellants place much emphasis on the fact that the Wrecsics are of advanced ages and questionable health compared to the Broughtons' relative youth and well-being. However, Mrs. Wrecsics is but 59 and her only ailment is a recently diagnosed case of diabetes, for which she administers to herself daily injections of insulin. She takes no other medicine and does not appear to be at all physically hampered. Appellee Henry Wrecsics is now 66 years of age and is retired from his position with Bethlehem Steel. Aside from a heart attack a number of years ago, which did not prevent him from later returning to work, he has had no recent serious illnesses and is able to physically meet his granddaughter's needs. The Wrecsics' income from social security and the steel company's pension appears more than adequate to provide for three people.

Appellants concede that Lisa's choice is, and has consistently been for several years, to remain with her grandparents. Several witnesses indeed attested that Lisa has always unwaveringly expressed a desire to live with the Wrecsics, visiting her parents only as relatives. The court below interviewed Lisa in chambers with counsel present. Her age at the time was 13 and she indicated she understood the nature of the proceedings and the roles of the various participants. The court later observed that Lisa appeared to be an intelligent, attractive, and well-adjusted young lady. During the interview, Lisa again expressed a strong preference to live with her grandparents whom she loves very

much and who she feels love her: "[M]y grandmother, she hugs me and kisses me. So does my grandpap. They really show that they love me." R.R. 256a. Her parents, by contrast, "never showed" that they love her, id., and she could not recall that her mother ever hugged or embraced her. R.R. 257a–258a. She views her mother only as a friend and thinks of her grandparents as her real parents. She chronicled many of her activities in the community, e. g., girl scouts, church choir, and reiterated her desire to attend a Catholic high school in the area.

We have recognized that a child's preference as to custody is not controlling upon the court, although it is a factor to be considered so long as it is based upon good reasons. *Husack v. Husack*, 173 Pa.Super. 192, 417 A.2d 233 (1979); *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978). "In assessing the weight to be accorded the child's preference, [her] intelligence and maturity are to be considered with increased weight being accorded the preference as the child grows older." *Husack,* supra, 417 A.2d at 235. Where the child is very young or can give no adequate reason for the preference, we have accorded the choice very little weight in our decisions. See, e. g. *McCourt v. Meyers*, 268 Pa.Super. 152, 407 A.2d 875 (1979); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). Where the child is somewhat older, however, and expresses an emphatic choice as to custody with good reasons, we have attributed considerable weight to that choice. See, e. g., *Husack,* supra (two boys, ages 16 and 14, expressed "strong" preference to remain with stepmother; custody awarded to stepmother); *Stoyko v. Stoyko*, 254 Pa.Super. 78, 385 A.2d 533 (1978) (ten year-old boy expressed "emphatic" preference for his father; custody awarded to father); *In Re Russo*, 237 Pa.Super. 80, 346 A.2d 355 (1975) (nine year-old boy's "adamant" preference for father; custody awarded to father); *Commonwealth ex rel. McDonald v. McDonald*, 183 Pa.Super. 411, 132 A.2d 710 (1957) (twelve year-old boy's "emphatic" preference to live with aunt; custody awarded to aunt).

In the instant case, the child was 13 at the time of the interview and is an intelligent, articulate, and sensitive girl. Her preference for her grandparents is nothing less than emphatic. The reason for her choice, as we read the record, is, very simply, that she does not feel loved by her parents while she does feel loved and welcomed by her grandparents. We cannot conceive of a more weighty reason for a child's preference.

We find this case to be similar to *Ellerbe* and *Albright*, supra. In both cases, the children involved had lived with the grandparents for a number of their youthful years, the grandparents providing the "single stabilizing factor in their lives" as against the chaotic, shifting lives of the parents. *Albright*, 421 A.2d at 160. The Court noted that the children had developed stable relationships and enjoyed secure, family environments with their grandparents which should not be disrupted. "At the time of the hearing in this case, [the 11 year-old child] had been living with her grandmother since she was less then two years old. [She] had developed stable and happy relationships with her grandmother, with neighborhood friends, and, importantly at school." *Ellerbe*, 417 A.2d at 515. The Court approved custody awards to the grandparents in both cases. Similarly, in the instant case, Lisa has lived with her grandparents continuously since 1971 and for all but two of her 14 years. Testimony was undisputed that she is loved and well cared for by the appellees, that her roots are firmly planted with them, with the community, with the school and church; and that her friends and activities are tied to the Wrecsics. Her parents, by contrast, have exhibited little concern for her over the years; have never contributed support and have never heretofore requested custody. Lisa has consistently preferred to live with her grandparents and visit her parents as circumstances permit. The lower court, which heard the testimony and judged credibility, determined that Lisa's best interests lie in remaining with appellees. We find no reason to disturb that decision.

Order affirmed.