546 A.2d 694

**In re DAVID L.C.**

**Appeal of EDNA C.**

Superior Court of Pennsylvania.

Submitted April 27, 1988.

Filed Aug. 24, 1988.

616

Samuel C. Totaro, Jr., Feasterville, for appellant.

William W. Norvell, III, Assistant Public Defender, Philadelphia, for appellee.

Before CAVANAUGH, WIEAND and DEL SOLE, JJ.

WIEAND, Judge:

In this custody dispute between the mother and great-grandmother of David L.C., the trial court awarded custody of David to his great-grandmother. The mother appealed.

Edna C. had been abandoned by an alcoholic mother and had been raised, together with her two brothers, by her grandmother. Edna was a superior athlete, with a demonstrated skill in the game of basketball. While attending school in Pittsburgh, she became pregnant at the age of

fourteen. At the age of fifteen, on February 23, 1984, she gave birth to David. She took her infant child to Philadelphia and left him with her grandmother, Jane M., until she could find an apartment in Pittsburgh. After several weeks, the child was returned to Pittsburgh where Edna had obtained an apartment and a baby-sitter. In July, however, Edna took the child back to Philadelphia and left him with Jane M. Subsequently, Edna went to live with her basketball coach in Pittsburgh and made plans to continue her education. The child remained in Philadelphia with Jane M., where he has continued to live. The parties agree that the child has been adequately cared for, is physically and emotionally well, and that a strong and loving relationship has developed between David and his great-grandmother. In the latter part of 1984, Edna completed counseling and decided to surrender the child for closed adoption. Jane M. objected to a closed adoption, and when Edna sought to take the child back to Pittsburgh for that purpose, Jane refused to surrender him. Jane M. made arrangements for the child to be cared for by the Pringles, who were friends of hers, when she worked nights (11 p.m. to 7 a.m.) as a practical nurse and, in May, 1986, took early retirement so that she could care for the child full time.

In April, 1985, Jane M. filed a petition to confirm custody; and in July of 1985, Edna filed a petition for writ of habeas corpus.[1] The two actions were consolidated and were heard before the Honorable Nicholas Cipriani. Edna testified that if she were awarded custody, she would deliver the child to an adoption agency, surrender all rights to the child, and terminate all relationship and contact with the child. Jane M. is now 64 years of age, and David is four years of age.

In this case, as in all custody determinations, a court's paramount concern must be for the best interests of the child. In reviewing a trial court's determination, an

---

1. The trial court observed that this procedure was improper and that Pa.R.C.P. 1915.3(a) required the filing of a complaint. Nevertheless, the trial court treated the petition as a complaint and entertained the merits thereof.

appellate court is not bound by the legal conclusions made by the trial court, nor must a reviewing court accept facts unsupported by competent evidence on the record. *Robinson v. Robinson*, 505 Pa. 226, 236, 478 A.2d 800, 806 (1984), quoting *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 295–296, 368 A.2d 635, 637 (1977). Issues of credibility or weight of testimony, however, must be left to the trial court, which has had the opportunity to observe the parties and witnesses. *Id.* "Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge." *Lombardo v. Lombardo*, 515 Pa. 139, 148, 527 A.2d 525, 529 (1987), quoting *Commonwealth ex rel. Rainford v. Cirillo*, 222 Pa.Super. 591, 597–598, 296 A.2d 838, 841 (1972). On appeal, we may only modify a custody determination if we find that the trial court's judgment is "manifestly unreasonable as shown by the evidence of record." *Murphey v. Hatala*, 350 Pa.Super. 433, 439, 504 A.2d 917, 920 (1986), *appeal denied*, 516 Pa. 634, 533 A.2d 93 (1987), citing *Mielcuszny v. Rosol*, 317 Pa. 91, 176 A. 236 (1934); *Commonwealth ex rel. Berman v. Berman*, 289 Pa.Super. 91, 432 A.2d 1066 (1981).

Although Jane M. is the great-grandmother of the child, her rights vis-a-vis those of the child's mother are no greater than those of any other third party. *Commonwealth ex rel. Miller v. Miller*, 329 Pa.Super. 248, 254, 478 A.2d 451, 454 (1984); *In re Custody of Hernandez*, 249 Pa.Super. 274, 287, 376 A.2d 648, 654–655 (1977).

> When the judge is hearing a dispute between the parents, or a parent, and a third party, ... [t]he question still is, what is in the child's best interest? However, the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must

do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*Ellerbe v. Hooks,* 490 Pa. 363, 367–368, 416 A.2d 512, 513–514 (1980), quoting *In re Custody of Hernandez, supra,* 249 Pa.Superior Ct. at 286, 376 A.2d at 654.

■ Although a third party must carry a heavy burden to prove that he or she can best provide for the child, it is not necessary to show that the natural parent is unfit. Since the child's best interests always govern, factors other than the fitness of the natural parent must also be weighed. *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 328, 421 A.2d 157, 161 (1980); *In re Custody of Hernandez, supra.* In the instant case, the natural mother made it clear that, if successful in obtaining custody of her son, she did not intend to care for him personally but would, instead, place him immediately in a closed adoption situation calculated to sever all contact between the child and his mother and all natural relatives.[2] It was in this setting that the trial court was called upon to determine whether Jane M. could better provide for the welfare of David.

To assist it in making this determination, the hearing court ordered that David be examined by a family court psychiatrist. The child had also been examined a year earlier. On the basis of these reports, the court observed:

2. With respect to Edna's desire to place David in a closed adoption situation, the trial court commented:

It thus seems quite apparent that the mother's overriding concern here is to shield her identity from her son. We are not saying that this is an improper motivation, for certainly thousands of adoptions involve similar considerations. As a college student with bright prospects in the sports world (N.T. 61), it is readily understandable why she would want to avoid the possibility of contact from her son during the next stage of her life. However, it should also be clear that in trying to sever all ties between David and the world he now knows, the mother is primarily motivated by a purpose other than the child's best interest.

The most recent report concluded that the child has "no major mental disorder" and has "essentially age-adequate development, with possible aspects of hyperactive behavior." (Report of Psychiatrist, P. 3) The report states that [Jane M.] was "able to firmly and authoritatively set limits with the child," although "she relates that the child is rather active in the home and this activity is quite difficult for [Jane M.] to manage ... She again stated that as much as she loves and cares for the child, she realizes certain physical needs will [be] present for the child and herself which might make it most beneficial for the child to be adopted by the Pringle couple." (Report of Psychiatrist, P. 3) In its conclusion, the report states that, "It is clear, from interview today, that [Jane M.] has invested a great deal of time with this child but also is aware of the shortcomings and limitations, particularly, as the child gets older and so does she ... If the child's future is such that he will not remain with [Jane M.], then I suggest that ample time on a graduated basis be granted, to help this child and any significant adults (who will play a role into his life), to accommodate to change, build trust and try to minimize any separation difficulty." (Report of Psychiatrist, P. 4)

The trial court concluded, therefore, that bonding had already occurred between the child and his great-grandmother and that the best interests of the child would not be served by a precipitous termination of the relationship.

Appellant contends that the trial court placed too much weight on the psychological bonding which had occurred between the child and his great-grandmother. It is correct, of course, that prior decisions of this Court have held that psychological bonding between a child and a third person, although significant, will not ordinarily outweigh the important interest which a natural parent has in the custody of his or her child. Therefore, the psychological bonding between the child and a third person is usually not an adequate reason for depriving a fit parent of his or her child. See: *Burke v. Pope*, 366 Pa.Super. 488, 531 A.2d 782 (1987)

(hearing court erred in weighing too heavily psychiatrist's testimony regarding psychological bonding and in finding that these bonds outweighed mother's right to custody of her children); *In re Donna W.,* 325 Pa.Super. 39, 472 A.2d 635 (1984) (psychological bonding with third party is an important factor, but court must consider all factors in determining best interest of child); *In re Desiree B.,* 304 Pa.Super. 461, 468–469, 450 A.2d 1003, 1007 (1982) ("The question of bonding should not be the only one or the deciding factor."). This is because the courts recognize that "the blood relationship of parenthood has traditionally served and continues to serve as our society's fundamental criterion for allocating control over and responsibility for our children...." *Ellerbe v. Hooks, supra,* 490 Pa. at 369, 416 A.2d at 514.

■ To award David to his natural mother in the instant case, however, would be to guarantee the termination of all vestiges of the blood relationship between parent and child. To remove David from the home of his great-grandmother would be to require him to begin his life anew in the home of a non-relative stranger, without any future communication with the blood relatives whom he has come to know and rely upon. In the face of this, the trial court could properly place greater weight on the bonding which already had taken place between the child and his great-grandmother. *Albright v. Commonwealth ex rel. Fetters, supra,* 491 Pa. at 327, 421 A.2d at 160. This bonding outweighed the natural mother's asserted right to place the child for adoption.

Edna argues further that the psychological bonding between the great-grandmother and the child is, in part, the result of Jane M.'s "deceptiveness and cunning" in delaying these proceedings and in refusing to surrender David to his mother. She argues that the trial court, in fact, rewarded Jane M. for improper conduct. See, e.g.: *Commonwealth ex rel Grimes v. Yack,* 289 Pa.Super. 495, 433 A.2d 1363

(1981). The trial court made no finding of bad faith on the part of the great-grandmother, and on the record before us, it is clear that there is no basis for this Court to substitute its judgment for that of the trial court. Edna's assertion that Jane M. was guilty of bad faith depended on the credibility of witnesses and was an issue wholly within the province of the trial court.

We, like the trial court and Jane M. herself, must necessarily be concerned about the possibility that the child's great-grandmother may, because of her age, become unable to care for David as he becomes older. We are also aware that as David becomes older the possibility of his being adopted into an established family setting will recede and ultimately disappear. The circumstances surrounding David's birth and early life have made his custody an issue requiring the trial court to exercise Solomonic wisdom. All solutions available to the court contained potential pitfalls.[3] Nevertheless, with respect to the alternatives available to it, the trial court selected for young David a homelife bounded by the stability, care, and natural love which have in the past come from the great-grandmother who also raised the child's mother. In so doing, the court did not abuse its discretion.[4]

The trial court's order, therefore, is affirmed.

3. The trial court observed:
   We obviously believe that this is a case that should be settled on the basis of some alternative other than the two available options of closed adoption by unknown third parties or continued custody by the great-grandmother. However, given the two choices before us, we have no doubt that the child's best interests mandate a finding that custody remain at this time with [Jane M.].

4. The record discloses that Jane M., because of her age, has also given consideration to the possibility of David's adoption, albeit in an open setting which would not sever completely David's relationship with his natural family. The trial judge, however, has made it clear that the award of custody to the great-grandmother was based on his conclusion that the best interests of the child would be served by allowing custody to remain with the child's great-grandmother, who is presently able to care for him. The matter of possible future adoption and the right of Jane M. to consent thereto were not decided by the trial court and are not now before this Court.