before us on appeal. *Cf. Estep v. Estep,* 508 Pa. 623, 500 A.2d 418 (1985) (Superior Court's scope of appellate review is exceeded when issue is considered sua sponte); *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975) (same). However, we have serious reservations regarding a rule that gives a trial judge the power to enforce an order that includes monetary sanctions for failure to accept a settlement. In the present case, Judge Sabo ordered the Treus to pay the court $17,500 as a sanction under Rule *212.2. Article 5, § 10(c) of the Pennsylvania Constitution gives our supreme court exclusive power to establish rules of procedure for all state courts. While the supreme court can delegate certain supervisory and administrative powers under 42 Pa.C.S. § 1721, we have found nothing to support an assertion that it has granted to the common pleas courts the type of power which is manifest in Rule *212.2. We also believe that there is a potential for misuse or abuse of power in a rule that permits a trial court to impose sanctions where the money flows directly back to that authority. Further, Rule *212.2 purports to supplement Pa.R.C.P. 212. However, a review of both rules reveals that they are not related in any way. Thus, we would seriously doubt whether the trial court has the authority to seek to enforce such a rule.

Because we have no record evidence that a settlement conference occurred or that the trial judge followed the procedures set forth in Philadelphia Local Rule *212.2, we reverse the order that imposed a $17,500 sanction upon the Treus for court costs pursuant to that rule.

Order Reversed.

McEWEN, J., concurs in the result.

E.A.L., Sr., and J.L.L., Appellants,

v.

L.J.W.

Superior Court of Pennsylvania.

Submitted March 28, 1995.
Filed July 25, 1995.

Michael R. Lynn, Bloomsburg, for appellants.

George O. Wagner, Danville, for appellee.

Before BECK, TAMILIA and CERCONE, JJ.

CERCONE, Judge.

This is an appeal from an order of the lower court awarding primary custody of two minor children to appellee. We vacate the trial court's order and remand for further proceedings.

J.L., one of the two subjects of this custody action, was born on April 22, 1981. At the time of J.L.'s birth, her mother (appellee) was sixteen years old. Appellee gave birth to a second child, J.R.L., the other subject of this action, on March 3, 1983. From the time of their births until August 7, 1992, J.L. and J.R.L. resided at the home of their grandparents (appellants). Appellee did not marry the fathers of either of the two children. Subsequently, however, appellee married and had three more children. J.L. and J.R.L. continued to live with appellants until August 7, 1992. On that date, appellee picked up the children from their grandparents on the pretense of going on a weekend camping trip. Appellee never returned the children to appellants' home. At the time of this occurrence, J.L. was eleven and J.R.L. was nine. Since August 7, 1992, appellee has retained primary physical custody of the children.

Appellants filed a habeas corpus petition for return of the children on September 23, 1992, in which they alleged that they had been "in loco parentis" to the children since April 9, 1984.[1] The trial court dismissed appellants' petition on the basis that it failed to conform to Pa.R.C.P., Rule 1915.15(a), which sets forth the form of a complaint for custody. On October 6, 1992, appellants filed a complaint for custody. The lower court referred the matter to Michael Dennehy, Esquire, Special Master, for further proceedings "upon receipt by the Court Administrator of Proof of Service."

Mr. Dennehy filed a report to the court on October 30, 1992, in which he recommended that primary physical and legal custody of the children be granted to appellants, with partial physical custody to appellee on alternating weekends, holidays, and in the summer. The master found that the sudden removal of the children from their grandparents' home was not in their best interests. (Master's Report, October 30, 1992). The lower court issued an order making the recommendations of the master an interim order for ten days or until exceptions were filed.

On November 12, 1992, appellee, by counsel, filed "Preliminary Objections Motion for Special Relief," asserting that the court and master lacked jurisdiction over appellee because she had not received personal service of the October 6, 1992 complaint in custody. The lower court granted appellee's motion to

---

1. On that date, appellee executed a "Power of Attorney over Minor Children" and "Authorization to Consent to Medical and Dental Treatment for Minor Children." By these documents, appellee authorized appellants to care for her children's needs, including their medical and dental needs.

dismiss, vacated the interim order based on the master's recommendations, and declared them a nullity.

On December 1, 1992, the lower court reinstated the complaint for custody upon appellants' request. The sheriff personally served the complaint on appellee. Again, the lower court referred the case to special master Dennehy who filed a report on December 31, 1992. In this report, the master found that appellants did not have standing to maintain the action for custody. However, because of the "long residency" of the children with appellants, the master recommended that appellants have liberal visitation. Appellants filed exceptions to the master's report on January 6, 1993. On January 12, 1993, the lower court made the master's report an interim order.

The lower court ordered home studies of both parties, and conducted a hearing in the matter on October 6, 1992. The lower court issued its opinion and order, per Naus, J., on December 13, 1993. The trial court found that appellants did have standing to seek custody of the children under the doctrine of *in loco parentis*, and granted primary custody to appellee with partial custody in appellants. The stamp date on the lower court's opinion indicates that it was not filed until January 11, 1994.[2] From that order, appellants file this timely appeal,[3] in which they raise the following issue: "Given the totality of evidence adduced at the custody hearing did the lower court err as a matter of law in not awarding primary custody of the two minor children to their grandparents?"[4]

▮ Our scope of review of a trial court's order of child custody is of the broadest type. *McMillen v. McMillen,* 529 Pa. 198, 202, 602 A.2d 845, 847 (1992).

In reviewing a custody order, an appellate court is not bound by findings of fact made by the trial court which are unsupported in the record, nor is it bound by the court's inferences drawn from the facts. However, on issues of credibility and weight of the evidence, an appellate court defers to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. Only where it finds that the custody order is "manifestly unreasonable as shown by the evidence of record ..." will an appellate court interfere with the trial court's determination. Therefore, unless the trial court's ruling represents a gross abuse of discretion, an appellate court will not interfere with its order awarding custody.

*Robinson v. Robinson,* 538 Pa. 52, 55–56, 645 A.2d 836, 837–38 (1994). The paramount concern in a child custody case is the best interests of the child. *McMillen v. McMillen, supra,* 529 Pa. at 202, 602 A.2d at 847. A determination of the best interests of the child is based on consideration of all factors which legitimately have effect upon the child's physical, intellectual, moral and spiritual well-being. *Wiskoski v. Wiskoski,* 427 Pa.Super. 531, 629 A.2d 996 (1993), *appeal denied,* 536 Pa. 646, 639 A.2d 33 (1993). The court in a custody action has the obligation to consider all relevant factors that could affect the child's well-being. *Clapper v. Clapper,* 396 Pa.Super. 49, 578 A.2d 17 (1990); *DeNillo v. DeNillo,* 369 Pa.Super. 363, 535 A.2d 200 (1987).

▮ In a custody dispute between a parent and a non-parent, the natural parent has a prima facie right to custody of the child. *In re Custody of Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977). The natural parent's right may be forfeited if convincing reasons appear that the child's best interests will be served by awarding custody to someone else. *Id.* at 285, 376 A.2d at 654. However, this standard

is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction

---

2. The original stamp date on the lower court opinion was January 3, 1994. However, that date has been crossed out and replaced with the January 11, 1994 date.

3. *Appellee* filed a motion for change of venue to Colombia County which the lower court granted. The docket sheets indicate that the lower court

granted the motion on December 3, 1993. The record further indicates that the case was filed in Colombia County on December 16, 1993.

4. Appellants filed this appeal on February 8, 1994. As we will discuss, *infra,* this appeal presents a current issue for this court to determine.

... [T]he standard seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, *other factors which have significant impact on the well being of the child can justify a finding in favor of the nonparent, even though the parent has not been shown to have been unfit.* *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 328, 421 A.2d 157, 161 (1980) (emphasis added). In a dispute between a parent and a non-parent, the burden of proof and of persuasion is on the non-parent, and that burden is heavy. *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980). However, the hearing court may award custody to a third party "where the best interests of the child will be clearly served by such a decision." *Albright, supra,* 491 Pa. at 326, 421 A.2d at 160.

The lower court heard the following testimony, *inter alia,* at the hearing. Appellant J.L.L. (grandmother) testified that after the births of J.L. and J.R.L., appellee would leave home for months at a time. N.T., October 6, 1993, at 7. When she was away, appellee did not communicate with appellants. *Id.* at 8. The children's grandmother testified that when appellee did return home to Bloomsburg, she would stay a couple of days at appellants' home and then would go away. *Id.* at 8. Appellants themselves took the children to church, Sunday school, bible school, and "five-day club." *Id.* at 16. They also went to skating parties and school activities. *Id.* During the time the children lived with appellants, appellee would take them for weekends at the most. *Id.* at 25.

Appellant E.L. (grandfather) testified that he brought both J.L. and J.R.L. home from the hospital. His daughter, appellee, left almost immediately after the children were born. *Id.* at 54. The grandfather indicated that he and his wife took the children to church and Sunday school, and gave them clothing, shoes, socks, medical care, and food. He stated that both children indicate that they do not want to return to their mother's home when their visitation with their grandparents ends. *Id.* at 65.

Sabrina Williams, Children and Youth Administrator for Columbia County indicated that appellee's family had been referred to her agency. *Id.* at 67–68. She stated that a number of case workers had been involved with the family during a short period of time due to transitions in the agency. *Id.* at 69. Ms. Williams testified that there was a notation in the file indicating that the parents and grandparents disagreed as to where the children should be and the parenting techniques used by the respective family members. *Id.* at 70. She indicated that based on her reading of the file, that the disagreement between the families was a stress on the children. *Id.* At the time of Ms. Williams' testimony, the file on appellee's family remained open due to the number of transitions that had taken place within the Children and Youth agency and the ongoing custody dispute between the parties. *Id.* at 69.

Mary Mordan, a former caseworker with Montour County Children and Youth Services, indicated that she had been involved with appellee's household. Ms. Mordan talked to appellee and her husband about discipline and housing conditions. *Id.* at 77. She indicated that the agency offered a parenting course which appellee and her husband attended sporadically. *Id.* Ms. Mordan found no substantiation to any reports of abuse in the family. *Id.* She stated that supervision was a "big issue" in appellee's household. The agency was also interested in the issue of alcohol consumption on the part of appellee's husband. *Id.* at 80. She testified that during the times she was in appellee's home, she did not observe any harsh discipline or excessive drinking. *Id.* at 81.

L.J.W., appellee, testified that the allegations by J.L. that appellee's husband had raped her, had been determined unfounded. *Id.* at 115. Appellee indicated that in December, 1992, she threw a pan at her husband and J.L. called the police to report the incident. *Id.* at 120. She testified that after J.L.'s birth, she (appellee) lived with her parents. *Id.* at 123. She stated that she would go away on weekends. *Id.* at 124. Appellee testified that in her younger years, her children were better off with her parents. *Id.* at 125.

In 1984, appellee married J.W. *Id.* They moved to Mill Street [5] and appellee talked to appellants about having her children back. She testified that appellants said that when she got a stable house and income, she could have them back. *Id.* at 125–26. The home on Mill Street had only one bedroom. *Id.* Appellee and her husband then moved to Catawissa for two years, and to Hess' Trailer Court for three years. *Id.* at 128–29. Next, they moved to Van Kirk Street. At that point, appellee asked her parents again for her children. *Id.* at 130. The parents refused because she didn't have enough income. *Id.* Appellee then sought legal help for return of the children. *Id.* at 131.

Appellee testified that the children are supposed to keep their rooms clean and take turns doing the dishes. She indicated that her husband hit the kids once. *Id.* at 140. Appellee also stated that when they lived in Danville, J.L. and J.R.L. went to church with two neighbor girls, and since they had moved to the Southern School District, they had gone to church once. *Id.* at 145.

J.L. testified it takes her a while to go to sleep because her mother and stepfather "yell" every night. *Id.* at 166. They also swear a lot, and her stepfather drinks beer. *Id.* The swearing bothers her, as does the parents' smoking. *Id.* at 166–67. On the weekends, they eat once a day. *Id.* at 168. She stated that she doesn't like her Mom because "she took us away from our Gram we have been with our gram for like 11 years." *Id.* at 169–70. She stated that she doesn't like her stepdad "since he raped me when I was nine years old." *Id.* at 173.[6] She states that her mom "won't do nothing with us." *Id.* at 175. She has seen her stepdad drunk "lots of times." *Id.* at 176. Her mother and stepfather have "dirty movies ... all over the house." *Id.* at 179.

J.R.L. testified that he visits with his grandparents every other weekend and missed his visit with them "only about

once.... because I didn't do my chores." *Id.* at 188. He does not talk on the phone to his grandparents that often. *Id.* He does not call them; they usually call him. *Id.* J.R.L. indicated that his stepfather drinks "about half a case [of beer] every night." *Id.* at 192. He testified that he wanted to "go back with my Gram ... because she treats us a lot better." *Id.* at 198–99. J.R.L. indicated that there are dirty movies in the house but he does not want to see them. *Id.* at 199–200. His stepfather had dirty magazines, but he got rid of them. *Id.* at 200. J.R.L. stated that if he gets back with his Gram, he just wants to stay there. *Id.* at 201. He does not want "to go through this again," and he hopes to get back with his "Gram." *Id.* His mother and stepfather always speak in foul language and this bothers him. *Id.* at 202. His stepfather picks him up by the shirt and throws him on the floor for the fun of it, and he (J.R.L.) does not like it. *Id.* at 203.

In the instant case, the lower court made the following findings:

1. Based on home studies, either home was adequate for the raising of children.[7]

2. Appellee's husband has had some questionable behavior "involving misuse and abuse of alcohol, and physically assaultive behavior." Appellee and her husband attended "many" of the parenting classes offered by Children and Youth Services.

3. Although mother was not a fit parent when she was young, she has changed her lifestyle, and has attempted to "involve the children in religious instruction by taking them to church and involving them with Child Evangelism Fellowship."

4. There is no evidence that appellee is an inadequate mother for the three half siblings of J.L. and J.R.L.

5. Appellee claimed that she had requested custody of her children from appellants but they had always refused to transfer custody to her.

---

5. Although the record is not clear, presumably the residences of appellee and her husband were in Montour or Colombia Counties.

6. Further questioning of J.L. by the lower court demonstrated the unlikelihood that a "rape" had occurred. However, J.L.'s testimony did not

omit the possibility that the stepfather may have illicitly touched her. *Id.* at 182.

7. We note that the home studies have not been included in the record certified to this court.

6. The fact that the children's grades are not as good as last year relates to the custody dispute and not to the environment of appellee's home.

7. Problems have occurred as a result of appellee's husband's remarks and threats, his refusal to allow phone calls between the children and appellants and the minimized number of visits with appellants as a result of appellee's and husband's behavior.

8. Some of the responsibility for the problems in the custody arrangement are the fault of the appellants.

9. Children and Youth will continue to be involved in the case to assist in counseling parents and children, to foster parenting skills, and to assist husband in controlling his behavior.

Trial court opinion, at 3–5. The lower court provided the following reasoning for its decision: (1) the law weighs heavily in favor of mother, the natural parent; (2) the law favors the raising of siblings together including half-siblings; and (3) the law permits modifications of custody arrangements at any time that change is appropriate. For these reasons, the lower court awarded custody to appellee, mother.

Appellants allege that as a matter of law, the trial court erred in awarding custody to appellee based on the totality of the evidence adduced at the hearing. As we indicated previously, under our standard of review in a case such as this, we are not bound by findings of fact of the lower court which are not supported by the record. *McMillen v. McMillen, supra.* Nor are we bound by the inferences which the trial court draws from the facts. In reviewing the findings of the lower court, we conclude that several of them are unsupported by the record.

The lower court indicated that appellee and her husband had attended many of the parenting classes offered by CYS. Our review of the record indicates that the appellee's and her husband's attendance at these classes was sporadic. The record shows that their *combined* attendance at the classes was only fifty percent.

The trial court found that although mother was not a fit parent when she was young, she has changed her lifestyle, and has attempted to involve the children in religious instruction. The record does not support a finding that mother has attempted to involve her children in religious instruction. She testified that she took them to church once and the children did not like it. There was no evidence that she has subsequently taken them to church. As to mother's change in lifestyle, the record shows mother and stepfather regularly view "dirty" movies. There was evidence that these films are physically available to the children. There was also an allegation that appellee and her husband have taken off their clothes in front of the children. N.T., October 6, 1993, at 181. Evidence was offered which could have corroborated the allegation. *Id.* at 63–65.[8] Also admitted was evidence of the use of foul language by appellee and her husband in the children's presence. Although the trial court found that mother has changed her lifestyle, there is substantial evidence that the home environment has many unwholesome aspects.

The trial court found that the drop in the children's grades relates to the custody dispute and not to the environment in mother's home. There is insufficient evidence in the record for this conclusion. Both children testified as to aspects of mother's home with which they were uncomfortable. J.R.L. also testified that he did not want to "go through this again." The trial court itself found that problems had arisen in the home as a result of the stepfather's behavior. CYS was aware of the stepfather's alcohol problem and felt that it was an issue. Also, it was obvious from the record that the transition to their mother's home from their grandparents' had been a difficult one for the children. The trial court did not obtain evaluations of the children which would support a conclusion that the cause of their lower school grades was solely the dispute between the parties and had nothing to do with the children's home environment or their abrupt transition to their mother's home.

We also disagree with the reasons given by the lower court for its decision. The lower

8. The lower court did not discuss this allegation in its opinion.

court cited *In re Hernandez, supra,* under which the natural parent has the prima facie right to custody unless convincing reasons to award custody to a third party are shown. However, as we have indicated, the *Hernandez* standard does not preclude the trial court from considering the best interests of the child. If convincing reasons are present indicating that the children's best interests will be served by an award to a third party, then the third party may be awarded custody. *Albright v. Commonwealth ex rel. Fetters, supra; Cardamone v. Elshoff,* —— Pa.Super. ——, 659 A.2d 575 (1995) (evidence showed convincing reasons supporting trial court's award of primary physical custody of fifteen year old daughter to her maternal aunt over child's mother's claim).

For example, in *Albright,* a custody dispute arose between the father of two of three siblings and the children's maternal grandparents after the children's mother died. The children had lived with the maternal grandparents off and on throughout their lives. The Superior Court affirmed the trial court's award of primary custody to the grandparents. 491 Pa. at 328, 421 A.2d at 160. The court reasoned as follows:

> In this case, the hearing court after conceding that the father had entered into an apparently stable second marriage and could provide a good home, nevertheless concluded that the maternal grandparents had presented sufficiently compelling reasons to justify the award of custody to them. Those factors which were deemed to be persuasive were that the children had been exposed to chaotic conditions throughout their lives as a result of the marital difficulties between the parents and that the home of the grandparents had proven to be the single stabilizing factor in their lives. In *Ellerbe [v. Hooks],* we held that the removal of a child from a secure and familiar environment was the type of factor that could justify the award of the child to a grandparent over the claim of a parent. The adverse effect upon the development of youngsters caused by the disruption of an established stable relationship has been well recognized in this area of the law.

*Id.* at 326–27, 421 A.2d at 160 (citations omitted).[9]

In *Ellerbe v. Hooks, supra,* the father sought custody of his eleven year old daughter who had been living with her maternal grandmother. The lower court awarded custody to the grandmother. On appeal, the Superior Court reversed, holding that the trial court had failed to give the parent-child relationship sufficient consideration. The Pennsylvania Supreme Court reversed and reinstated the award of custody to the maternal grandmother. The Supreme Court recognized the importance of the blood relationship between parent and child. In this respect, the court agreed with the decision of the Superior Court. 490 Pa. at 370, 416 A.2d at 514–15. The court, however, found that the Superior Court erred in awarding custody to the father upon the facts of that case. The court reasoned as follows:

> [O]ur review of the record convinces us that the trial court's determination may still stand. At the time of the hearing in this case, Carla, then eleven years old, had been living with her grandmother since she was less than two years old. Carla had developed stable and happy relationships with her grandmother, with neighborhood friends and, importantly, at school. In these circumstances we are unwilling now to disturb the trial court's order granting custody of Carla to her grandmother.

*Id.* at 371, 416 A.2d at 515.

In both *Ellerbe* and *Albright,* the court awarded custody to the grandparents on the basis that both of those homes provided the children with secure and stable relationships and an environment which also provided familiarity and security. These factors were found to be convincing enough to defeat the natural parent's right to custody. In the instant case, we have a quite similar situation. J.L. and J.R.L. had resided with their

---

**9.** The *Albright* court also found that the children's best interests would be served by an award of primary custody to the grandparents because they would not be separated from their half-sibling as they would be if their father received custody of them. Id. at 328, 421 A.2d at 160.

grandparents for a substantial number of years. It is apparent from the testimony at trial that both children were happy with the arrangement. The trial court, however, completely failed to evaluate this factor.

Many cases have recognized the importance of stability in a child's development and adjustment. *See R.A.R. v. T.M.,* 434 Pa.Super. 592, 596, 644 A.2d 767, 769 (1994) ("changes in custody can seriously disrupt a child's life"); *Fisher v. Fisher,* 370 Pa.Super. 87, 92, 535 A.2d 1163, 1166 (1988) ("courts have long recognized the importance of a continuing and stable custodial relationship with a parent which satisfactorily serves the child's needs"); *Gonzalez v. Gonzalez,* 337 Pa.Super. 1, 486 A.2d 449 (1984) (in determining which placement of child would serve child's best interests, one vitally important factor to be considered is effect upon child of removal from a known physical environment with an established parental figure); *English v. English,* 322 Pa.Super. 234, 469 A.2d 270 (1983) (this court has noted the importance to a child's development of a stable relationship with an established parental figure and a known physical environment). In *Commonwealth ex rel. Bankert v. Children's Services,* 224 Pa.Super. 556, 307 A.2d 411 (1973), the court discussed this concept in depth in a case where an adoption agency sought return of a nine year old child from her foster parents:

> Of extreme significance ... is the fact that Charlene has been in the care and custody of appellants throughout her development from an infant of three weeks to a child of nine years. After such a period of time, a child "becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury.... Nothing could be more cruel than the forceable separation of the child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection." ... "The emotional disturbance to a child that would threaten from its being removed summarily and permanently from familiar and agreeable surroundings and associations, incident to the only parental control and supervision it has ever known could have a very harmful effect on the child's whole life." ... The continuous custody of Charlene with appellants for all but the first three weeks of her life, and the emotionally devastating effects which could result from a forced separation are matters which should be seriously weighed in determining the child's best interests.

*Id.* at 561–62, 307 A.2d at 414 (citations omitted).

The stability a child has enjoyed in a long-standing custody arrangement, and the happy relationships a child has developed with a parental figure and others may be decisive factors in a custody decision. *See R.A.R. v. T.M., supra; In re David L.C.,* 376 Pa.Super. 615, 546 A.2d 694 (1988) (award of child custody to great-grandmother was proper where great-grandmother had been providing child with home life, stability, care, and natural love and bonding had taken place between child and great-grandmother); *Parker v. MacDonald,* 344 Pa.Super. 552, 496 A.2d 1244 (1985) (attachment of child to those standing *in loco parentis* and who have tenderly cared for him can in some instances be controlling in custody decision); *Albright, supra; Ellerbe v. Hooks, supra; Wrecsics v. Broughton,* 285 Pa.Super. 90, 426 A.2d 1155 (1981) (in dispute between grandparents and parents, court awarded custody to grandparents who had cared for child for all but two of her fourteen years and with whom child had established firm familial and community ties). In a case which presents the possibility of a change in custody, it is incumbent on the court "to fully discuss the possible effect on the child of the proposed transfer of custody." *English v. English,* 322 Pa.Super. at 240–41, 469 A.2d at 273. *Accord R.A.R. v. T.M., supra.* In the instant case, the lower court failed to discuss and consider this important and obvious factor.

In addition, the lower court did not address the preferences of the children as expressed in their testimony. The preference of children in a custody case, although not controlling, is a factor to be carefully

considered, as long as it is based on good reasons. *Constant A. v. Paul C.A.,* 344 Pa.Super. 49, 496 A.2d 1 (1985); *Hugo v. Hugo,* 288 Pa.Super. 1, 430 A.2d 1183 (1981). As children grow older, more weight must be given to the preference of the child. *Grieb v. Driban,* 312 Pa.Super. 371, 458 A.2d 1006 (1983); *Palmer v. Tokarek,* 279 Pa.Super. 458, 421 A.2d 289 (1980). Here, the children, ages 12 and 10 at the time of the hearing, expressed good reasons for their preference for their grandparents' home. In the mother's home, there are dirty movies, foul language, yelling, sexual activity by the parents within the children's hearing, smoking and drinking. There is also the stepfather, who yells at them a lot, who picks up the boy and throws him on the ground "for fun," who may have fondled his stepdaughter, who drinks regularly and to excess, and who limits contact with the grandparents. There is also a deficiency in the number of meals served. In contrast, in the grandparents' home, the evidence showed that the children were taken to church and were involved in activities, and were prepared regular meals. In the grandparents' home, the grandparents did not smoke, drink to excess, watch dirty movies, use foul language, etc. The children's preference for their grandparents' home was rational, and showed an innate preference for a more "wholesome" atmosphere. The trial court erred in failing to explain why such preferences were rejected.

The trial court also relied too heavily on the policy of the law which favors the raising of siblings together. That policy is only one factor which the court must consider and it is not controlling. *Tobias v. Tobias,* 248 Pa.Super. 168, 374 A.2d 1372 (1977) (policy that it is preferable for siblings to be raised together was only one of factors necessary to determine best interests of child); *In re Russo,* 237 Pa.Super. 80, 346 A.2d 355 (1975) (although it is preferable as

general rule to have siblings raised together, this rule must yield to paramount principle that best interests of child must be determining factor in custody case). In this case, the trial court placed great reliance on this factor to the exclusion of other equally important ones.

In a custody action, the particular circumstances of the case must be considered. *Tobias v. Tobias, supra.* Each case is to be decided on its own individual facts. In this case, the trial court failed to consider many significant facts peculiar to this case, including the children's long standing residence with their grandparents, and the effect on them of an abrupt and unplanned transition to their mother's home. In this case, it appears the children's mother was incapable of caring for them during her youthful years because of her own immaturity. The grandparents filled in for the void left by the mother's absence and attention to other matters. During the time that the mother was attempting to mature and establish a stable lifestyle, the children were living and growing in the grandparents' home, being nurtured by the love of the grandparents and being provided for by them. When mother reached a point in her life where she felt capable of assuming her responsibilities for her children, she "took" them from their grandparents' home, which had in essence become their home. Although it is understandable that mother would want her children with her, her abrupt actions overlooked the attachments and the sense of security and familiarity that her children had formed in the grandparents' home. It is obvious from the poignant testimony offered at trial that the transition to the mother's home, which was unfamiliar and extremely different from appellants', and to which the children were taken with no warning or preparation, was extremely difficult for the children.[10] In

---

10. We must note our disapproval of the manner in which these children were taken from appellants' home. Appellee testified that she had asked her parents for the return of her children and that they had refused. In such a case, it was incumbent upon appellee to file a legal action to establish her right to the custody of her children. *See In re Custody of Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977) (natural mother filed

writ of habeas corpus to regain custody of child from couple to whom she had relinquished custody in order to finish her high school education). Such a step would have allowed an orderly legal procedure for the transfer of custody to the mother should the lower court have so decided. This was not a case in which there were allegations of mistreatment of the children by appellants.

assessing the children's best interests, the trial court failed to consider these basic and undeniable facts.

The trial court also failed to develop a complete record. *See English v. English, supra* (in contested custody case, trial court has duty to ensure that record is complete). The court did not solicit competent expert testimony to assist it in determining the effect of the transfer of custody on the children. This was necessary in order for the court to be fully informed on this aspect of the case. Nor did the lower court require that appellee's husband testify. This was error. It was obvious from the testimony at the hearing that the stepfather's conduct and behavior with and around the children were an issue. In light of the stepfather's frequent contact with the children living with him and his status as a parental authority, it was incumbent upon the trial court to take his testimony and subject him to cross-examination in order to fully inform the court as to the mother's home environment and the stepfather's relationship with the children. *See Haller v. Haller,* 377 Pa.Super. 330, 547 A.2d 393 (1988) (trial court should have required testimony of mother's boyfriend in light of his frequent contacts with children, his disciplining of them, and his acting in a quasi-parental role).

The trial court also failed to discuss as a factor whether the conduct of the custodial parent (appellee) resulted in obstruction of visits with the non-custodial family (appellants). The courts of this Commonwealth will not tolerate such interference with a lawful order of court. *English v. English, supra; Pamela J.K. v. Roger D.J.,* 277 Pa.Super. 579, 419 A.2d 1301 (1980). There was evidence in this case that appellee and/or her husband engaged in such conduct. It was incumbent on the lower court to consider this factor in its decision.

For all of the above reasons, we must vacate the final order of the lower court awarding primary physical custody of the children to appellee and remand the case to the lower court for a re-determination of custody taking into account all relevant factors as we have set forth in this case. It is necessary to remand this case so that the lower court can address crucial factors which were obviously present. Remand is also necessary so that the lower court can correct other errors: its assignment of great weight to certain factors while totally ignoring other equally significant ones, its failure to obtain expert testimony which was necessary to resolve the critical issues raised by the particular circumstances of this case, and the making of findings which were not supported by the evidence, constituting a gross abuse of the lower court's discretion.

We recognize that a substantial period of time has passed since the trial court's decision, and the children have now been in appellee's custody for over two years. Some of this delay can be attributed to delay in the transmission of the certified record to this court.[11] The normal length of time allowed for filing of briefs in this court also explains the passage of time. During the period of time that this case has been on appeal, this court has not received or been apprised of any action by the parties which would merit immediate concern for the proper placement of the children. Therefore, on remand, the children are to remain in appellee's custody under the current arrangement pursuant to a temporary order of court until the lower

---

We also note our disapproval of what appears to have been the role of counsel for appellee in the removal of the children from appellants' home. On August 7, 1992, the same date on which appellee picked up the children for the alleged "camping trip," counsel for appellee wrote a letter to appellants advising them of appellee's intention to keep the children, revoking her authorization to appellants for medical treatment of the children and their power of attorney as to them, and advising them that the children would "need their clothes and other things as soon as possible."

A member of the bar, in handling a matter involving the custody of minor children, must proceed with great sensitivity to the possibility of psychological/emotional harm to the children and should advise procedures and actions which will minimize such possibility. Counsel should not advise actions which have a likelihood of producing harm or trauma to the children involved.

11. The appeal in this case was filed on February 8, 1994, and the record was received from the lower court on August 23, 1994.

court renders a new final order of custody in accordance with this memorandum.

Upon this court's relinquishment of jurisdiction, the lower court may make modifications of the temporary order of custody as necessary to serve the children's best interests until a new final order of custody has been made. On remand, the trial court must assess the children's preferences in light of their maturing years, and fully investigate any further involvement by Children and Youth Services with appellee's household. If counseling is necessary to assist the parties or the children in complying with any order of this or the lower court or to facilitate the children's adjustment in their custodial situation, the lower court is directed to order it.

Order vacated; case remanded to lower court for entry of temporary order of custody in appellee with partial custody in appellants as per the current arrangement, and for further proceedings in accordance with this memorandum; jurisdiction relinquished.

BECK, J., concurs in the result.