J-A21045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| L.D.S., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| R.J.S., | |
| Appellant | No. 648 EDA 2014 |

Appeal from the Order Entered January 30, 2014
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2003-19168

BEFORE: BOWES, OTT, and STRASSBURGER,[*] JJ.

MEMORANDUM BY STRASSBURGER, J.:           **FILED AUGUST 11, 2014**

R.J.S. (Mother) appeals from the order of January 30, 2014,[1] which transferred primary physical custody of S.S. (Child) from Mother to L.D.S. (Father). Also before us is Mother's Emergency Motion for Stay. After careful review, we deny Mother's motion as moot; vacate the January 30, 2014 order; and remand for the entry of a custody order consistent with this memorandum.

Mother and Father married in September 1997, Child was born in August 1998, and Mother and Father were divorced by decree entered in November 2000. At all times since the divorce, the parties have shared

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The order is dated January 29, but was not filed until January 30, 2014. We have amended the caption accordingly.

legal custody of Child, and Mother has had primary physical custody of Child in Montgomery County, Pennsylvania. Father has resided in Alexandria, Virginia, where he now lives with his wife (Stepmother), their two children M.S. and C.S. (collectively Stepsiblings), and Stepmother's mother. The frequency and duration of Father's periods of partial physical custody of Child, as well as his exercise of that custody, are issues that the parties have litigated in Montgomery County, by petitions to modify custody and for contempt, since 2003.

Between September 2012 and January 2014, Father's physical custody schedule in Virginia included one scheduled weekend each month during the school year; half of Child's spring break; an additional five weekends of Father's choosing; and eight weeks of Child's summer vacation. Mother and Father alternated major holidays from year to year. The September 2012 custody order also provided that Father and Child "commence counseling immediately." Order, 9/6/2012, at 11.

However, Child spent only a fraction of the scheduled time with Father, and the ordered counseling neither commenced immediately nor occurred with regularity or frequency. The trial court summarized the resultant continuation of the litigation as follows.

> On December 21, 2012, Mother filed a "Petition to Modify" requesting the visits between Father and [C]hild occur in Pennsylvania. On January 17, 2013, Mother filed a "Petition for Contempt and Modification," in part, seeking the same relief. On February 19, 2013, Father filed a "Petition for Special Relief Seeking a Psychiatric Evaluation of Mother." On April 25, 2013,

Mother filed a "Petition to Modify" and, on April 27, 2013, she filed a "Petition for Contempt." On August 27, 2013, Father filed a "Petition for Contempt" and an "Emergency Petition to Modify Custody and Request for Primary Physical Custody." On December 23, 2013, Mother filed a "Petition for the Appointment of a Guardian Ad Litem" and a "Petition for an Updated Custody Evaluation." The parties appeared before the [trial court for hearings] on the outstanding petitions on October 24, 2013 and January 14, 201[4]. On January 29, 2014, the [trial court] entered a custody order (and "Findings of Fact" explaining the reasoning behind the custody order) which kept the shared legal custody provision intact but [following the end of the school year,] awarded primary physical custody to Father subject to Mother's partial physical custody for eight weeks in the summer, one weekend per month and five additional custody weekends that could be used any time during the year. The trial court also ordered Father and [C]hild to undergo counseling immediately and intensive counseling in the summer of 2014.

Trial Court Opinion, 3/24/2014, at 1-2.

Mother timely filed a notice of appeal and a concise statement of maters complained of on appeal on February 27, 2014, and the trial court filed its opinion on March 24, 2014.

Mother states the following questions for our review.

1. Did the trial court abuse its discretion and commit an error of law in concluding that it was in the Child's best interests to be in Father's physical custody, and by finding in Father's favor on factors [3, 4, 9, and 10 of 23 Pa.C.S. § 5328(a)], when the same court, by custody order of September 5, 2012, found in Mother's favor on the same factors?

2. Did the trial court abuse its discretion and commit an error of law in analyzing factors [1, 8, 13, and 16 of subsection 5328(a)], and in its ultimate conclusion?

3. Was the trial court's conclusion to award primary physical custody to Father the result of partiality, prejudice, bias and ill will against Mother and the minor Child and in favor of Father?

- 3 -

>      4.      Did the trial court abuse its discretion and commit an
> error of law by concluding that the Child's preference to remain
> with Mother was not well-reasoned?

Mother's Brief at 1-2 (suggested answers and unnecessary capitalization omitted).

Examining Mother's questions on appeal collectively, it is clear that she is arguing that proper application of the statutory factors requires a conclusion that it is in Child's best interests to remain in Mother's primary physical custody. Thus, rather than examine each of her questions separately, we shall consider the trial court's factual findings and reasoning that led it to the opposite conclusion to determine whether it committed an error of law or abuse of discretion.

> Our standard of review of custody determinations is as follows.
>
> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***J.R.M. v. J.E.A.***, 33 A.3d 647, 650 (Pa. Super. 2011) (quoting ***Durning v. Balent/Kurdilla***, 19 A.3d 1125, 1128 (Pa. Super. 2011)).

Once a custody order is in place, a court may modify it on petition "to serve the best interest of the child." 23 Pa.C.S. § 5338(a). In performing the best-interests analysis, a trial court is required to consider the factors set forth at 23 Pa.C.S. § 5328(a). *See E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011) ("[W]hen a party files a petition for modification of a custody order, the trial court must perform a 'best interests of the child' analysis considering all of the section 5328(a) factors.").

The section 5328(a) custody factors are as follows.

(1)    Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2)    The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3)    The parental duties performed by each party on behalf of the child.

(4)    The need for stability and continuity in the child's education, family life and community life.

(5)    The availability of extended family.

(6)    The child's sibling relationships.

(7)    The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)    The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)   Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)  Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)  The proximity of the residences of the parties.

(12)  Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13)  The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14)  The history of drug or alcohol abuse of a party or member of a party's household.

(15)  The mental and physical condition of a party or member of a party's household.

(16)  Any other relevant factor.

23 Pa.C.S. § 5328(a).

In examining the trial court's analysis, both in 2012 and in 2014, of the factors challenged by Mother on appeal,[2] it appears that little has

_____

[2] The only factor not challenged by Mother on appeal which favors one party over the other is factor 6.  "The policy of this Commonwealth is that, where possible, siblings should be raised together absent compelling reasons to do otherwise."  **L.F.F. v. P.R.F.**, 828 A.2d 1148, 1152 (Pa. Super. 2003) (quotation marks omitted).  "[T]his policy applies equally to half siblings." **Gancas v. Schultz**, 683 A.2d 1207, 1213 (Pa. Super. 1996). "However, this policy is a consideration in, rather than a determinant of, custody arrangements."  **L.F.F.**, 828 A.2d at 1152.   Child's Stepsiblings live in
*(Footnote Continued Next Page)*

changed factually. Rather, the lack of improvement in the compliance of Mother and Child with the custody orders led the trial court to conclude that a new custody arrangement was necessary to force Child to have a relationship with Father.

Factor 4 requires the trial court to consider Child's need for stability and continuity in education, family life, and community life. In 2012, the trial court emphasized the importance of this factor:

> There is a need for stability and continuity in [Child's] life which [the trial c]ourt hopes to provide with this custody order. Stability and continuity in [Child's] life requires **both** parties to cooperate and enforce the order. [Child] has been enrolled in the Lower Merion school system for the majority of his school years. He has numerous friends, hopes to enroll in TSA or the Science Olympiad and therefore the [trial c]ourt is hesitant to remove him from this school system. Furthermore, [Child] has an IEP and is vested with the school system.

Order, 9/6/2012, at 4 (emphasis in original). In 2014, the trial court acknowledged that factor 4 continued to weigh heavily in favor of maintaining primary physical custody with Mother, but concluded that it was overshadowed by the need to strengthen Child's relationship with Father.

> The [trial c]ourt acknowledges the need for stability and continuity in [Child's] educational, community and familial life. Mother testified that while [Child] was initially diagnosed on the

_(Footnote Continued)_ _____

Virginia with Father. Father testified that Stepsiblings adore Child, and that Child has a good relationship with them. Child testified that there is not "anything particularly special" about his relationships with Stepsiblings, N.T., 10/24/2013, at 120, who are both significantly younger than Child and have never lived with Child full-time. Nonetheless, we note that this factor weighs in favor of Father.

autism spectrum, she has worked hard as his educational advocate over the years and was successful in mainstreaming him into regular classes. [Child] has been enrolled in the Lower Merion school system for the majority of his school years, has an IEP, and achieves excellent grades. Mother testified that [Child] has significant extracurricular involvement to create ties to the community including weekend cleanups, working the polls on Election Day, and tutoring younger children. Father disagreed with this assertion and maintained that [Child] only recently began participating in some of these activities. Father presented testimony of the school district where he lives as well as the many extracurricular activities that are available for [Child]. While the [trial c]ourt understands that [Child] has always lived in Pennsylvania, it is the [trial court's] duty to weigh the need for stability and continuity in [Child's] life against the significance of the father-son relationship, which is not being fostered in the present environment.

Findings of Fact, 1/30/2014, at 4.

In denying Father's request for primary physical custody of Child in 2012, the trial court stated as follows regarding factor 1 (which party is more likely to encourage frequent and continuing contact between Child and the other parent).

Father testified that, if given primary physical custody, he would cooperate with Mother as it is his belief that the primary custodial parent has to be cooperative with the non-custodial parent to foster a relationship. While the [trial c]ourt was concerned about how, during trial, Mother was unable to put herself in Father's position as the non-custodial parent and consequently unwilling to give Father more custodial time; the subsequent emails submitted to the [trial c]ourt demonstrated that Mother was willing to ensure Father received his summer custodial visitation.

Order, 9/6/2012, at 3. In 2014, the trial court offered the following discussion of this factor, which evidences the trial court's increased frustration with Mother and Child.

- 8 -

It is [the trial c]ourt's opinion that Father would be more likely to encourage and permit frequent and continuing contact between [Child] and Mother. Father testified that, if given primary custody, he would ensure that [Child] maintained contact with Mother. The [trial c]ourt did not find Mother credible when she testified that she has encouraged [Child] to visit Father in Virginia. [Child] consistently has not abided by [the trial c]ourt's orders to spend the entire summer, break or weekend time with Father. For example, [Child] did not attend his summer custodial period with Father in 2012, and in 2013, after an emergency conference where [the trial c]ourt ordered [Child] to go to Virginia for three weeks, he still refused. Despite these blatant violations, Mother has not punished [Child] for his behavior, which leads [the trial c]ourt to believe that she does not believe his conduct is a problem. Moreover, according to Father, Mother "populates" the *OurFamilyWizard*[3] calendar with activities, trips and appointments that thwart his custodial time.

Rather, Mother consistently files petitions to modify custody in an attempt to lessen Father's custodial time (even though the judges of this Commonwealth have emphasized the need to retain Father's rights to custodial time) and creates excuses for [Child] as to why he cannot spend the requisite time with Father (for example, activities, trips, etc.). At the January 14, 2014 hearing date, Mother testified that she would like a custodial schedule in which Father's summer schedule is shortened to six weeks (no longer than one or two weeks at a time) and Father's five extra weekends per year are removed. Mother also testified that she believes it is preferable if Father travels to Philadelphia for his custodial time even though Father is remarried with two young children and has a full-time dental practice where he is on call at the hospital for dental related traumas.

Mother's failure to encourage and support Father's custodial rights has been an ongoing problem. In the [trial

_____

[3] "Our Family Wizard is a subscription-based website which is designed as a medium for divorced or separated parents to communicate and manage issues regarding shared parenting." **Wilcoxon v. Moller**, 132 So.3d 281, 284 n.1 (Fla. App. 2014).

court's] September 5, 2012 "Findings of Facts," we noted that Mother imposed no consequences on [Child] for his defiance of authority and advised her to adopt structure and disciplinary techniques. That has not occurred. Instead, [Child] continued to violate [the trial c]ourt's orders. It is evident that Mother chose to ignore the [trial court's] advice to the detriment of [Child].

Findings of Fact, 1/30/2014, at 2-3 (footnotes omitted).

Factor 7 considers the well-reasoned preference of Child. Child indicated both in 2012 and in 2014 that he preferred to remain with Mother. In 2012, the trial court accepted Child's preference.

The [trial c]ourt interviewed [Child] on July 24, 2012 and found him to be mature with good judgment. To protect the confidentiality of this communication, the [trial c]ourt will not reveal all the details but will state that [Child] relayed that Mother does encourage him to spend time with Father and that she has tried everything to make him comply. However, [Child] revealed that his disinterest [*sic*] in spending time with Father stems from the fact that Father asks questions about Mother's family which make him uncomfortable and that [Stepmother] and Father speak derogatorily about Mother and her family. It appears that [Stepmother] has a derogatory nickname for Mother that upsets him. [Child] feels that the questions Father asks are not sincere but are geared toward the custody battles. [Child] agreed to return to Virginia to make an attempt to work out his differences with Father. On or about August 3, 2012, [the trial c]ourt entered an Order addressing some of [Child's] concerns, and the parties are directed to set up counseling with Father and [Child].

Order, 9/6/2012, at 4-5. However, in 2014, the trial court changed its opinion of Child's judgment.

Most recently, [Child] testified before the [trial c]ourt on October 24, 2013 and January 14, 2014. On January 13, 2014, [Child] stated that he did not want the custodial schedule to change. However, the [trial c]ourt did not conclude that [Child's] preference was well-reasoned. For example, at the

October 24, 2013 hearing [Child] testified that Father "threatens" and "taunts" him. When asked to provide specifics of any incidents, [Child] testified that father told him to go to his room and stay there. During spring break [in] 2013, [Child] testified that he called the police because he felt "threatened" even though Father was not home at the time that the police were called. Contrary to Father's testimony, [Child] testified that he has not spent any time with Father and that Father is not nice to him. The [trial c]ourt did not find [Child] credible as the [trial c]ourt concluded that [Child's] perception is extremely tainted and [Child] has a tendency to exaggerate incidents.

Findings of Fact, 1/30/2014, at 5 (footnote omitted).

Pursuant to factor 8, the trial court is to consider the attempts of a parent to turn Child against the other parent. In 2012, the trial court found that

both parents may engage in that type of behavior to some degree. As already discussed, [Child] testified to the derogatory comments made by Father and his family. However the [trial c]ourt was concerned about the story relayed by Lisette Parks[4] where [Child] allegedly stated that Mother did not want him to speak to Lisette who has an obvious love and affection for [Child] and cherished her relationship with him. Furthermore, the [trial c]ourt finds the chain of emails, as to which parent is actually using [Child] to obtain information, is also despicable.

Order, 9/6/2012, at 5. The trial court offered the following analysis of factor 8 in 2014.

The [trial court] is concerned that Mother fosters and/or is content with an atmosphere that relegates Father to a lesser status in the eyes of [Child]. While both parties claim not to make derogatory comments about the other parent in the presence of [Child]; [Child] testified that father and his family

_____

[4] It is unclear to this Court who Lisette Parks is. It appears that she might be a relative of Stepmother.

- 11 -

make derogatory comments about Mother and call her names in Spanish. While Father did acknowledge that some comments were made about Mother; the [trial c]ourt did not find that the comments were outrageous or ongoing. Although there is no evidence that Mother is openly degrading Father to [Child]; as discussed in detail in 23 Pa.C.S. § 5238(1), Mother's failure to discipline or provide consequences for [Child's] constant violations of the custody orders has enabled [Child] to refuse to go to Father's and/or to create turmoil when he does attend the visits.

Findings of Fact, 1/30/2014, at 5.

Factor 9 requires the trial court to weigh which party is more likely to maintain a loving, stable, consistent and nurturing relationship with Child adequate for Child's emotional needs. Along the same lines, factor 10 requires the court to determine which parent is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of Child. In 2012, the trial court offered the following discussion of factors 9 and 10.

It was evident to the [trial c]ourt that both parties love [Child] and either would maintain the relationship appropriate for his needs. The [trial c]ourt had some concerns about Father's rigidity and need to make points. This became evident through his testimony, emails and conversations. Father needs to be cognizant that [Child] is now a teenager with his own ideas, needs and opinions and the [trial c]ourt is hopeful that counseling will help Father and [Child] develop the means for a healthier and more mutually acceptable mode of communication.

* * *

As noted above, it was evident to the [trial c]ourt that both parties love [Child] and either would maintain the relationship appropriate for his needs. At this point in [Child's] life however, the [trial c]ourt finds that Mother would be more likely and able to attend the physical[,] emotional and educational needs of

- 12 -

[Child].  [Child] has always lived with Mother and attended the same school district.  [Child] really likes his school and is excited about the new school year.  There was no testimony presented that Mother failed to ensure that [Child's] medical needs were [] tended to and Mother appears to have the time and ability to be available for [Child].

Order, 9/6/2012, at 5-6.  The testimony offered at the hearings leading up to the trial court's 2014 custody order revealed that Father did not follow through with the court-ordered counseling, and his relationship with Child had deteriorated.  Nonetheless, the trial court analyzed factors 9 and 10 quite differently in 2014.

> Both parties are capable of maintaining a loving and nurturing relationship with [Child]; however, Mother must realize that part of [Child's] emotional needs is to support a relationship with Father.  Father testified to his belief that [Child] is under a great deal of pressure to make Mother happy.  For example, Father testified that [Child] will not let Father take pictures of him having a good time in Virginia.
>
> The [trial c]ourt has concerns about [Child's] anger at his Father, his persistence in not spending time with him and the vastly different stories that are told by Father and [Child].  For example, Father testified to the loving relationship between his Virginia family and [Child] and the great time everyone had on Thanksgiving.  When [Child] testified, he indicated that he did not feel close to his half-siblings and he begged his aunt and uncle to let him go home with them.  At this point, without substantial counseling, the [trial c]ourt has concerns about whether Father can solely repair the relationship with [Child].  If Father is willing and committed to engage in serious and meaningful therapy with [Child] (which he says that he is), [the trial court] believe[s] that father would be able to institute the structure necessary to maintain a more stable and consistent relationship for [Child].

* * *

Mother has been instrumental in [Child's] educational progress, specifically, in having the "autistic" label removed from [Child] in 2007 and mainstreaming him thereafter. Father attends the yearly IEP meetings by phone. As primary custodian, Mother has been more likely to attend to [Child's] developmental and special needs (regarding schooling); however, the [trial court] believes that Father is also capable of attending to these needs if [Child] is in his primary custody. While both parties are capable of attending to [Child's] physical needs, Mother must realize that part of [Child's] emotional needs is to support a relationship with Father. It is [the trial c]ourt's conclusion that Father would be more likely to attend to [Child's] emotional needs, in that he is understanding of [Child's] need to have contact with both parents.

Findings of Fact, 1/30/2014, at 5-6.

The level of conflict and cooperation between the parents is the focus of factor 13. Again, nothing appears to have changed over the years regarding this factor. The trial court noted the high degree of conflict and lack of cooperation both in 2012 and in 2014.

Testimony revealed that there is a great level of conflict between the parties and their unwillingness and inability to cooperate with one another. The parties are both obviously intelligent and bear considerable anger against each other. It was very apparent that their respective strong wills make[] it nearly impossible to encourage co-parenting strategies. Furthermore, the [trial c]ourt noticed an underlying difference in the ideologies the parties have for parenting [Child]. At one point during the testimony, Father stated he believed "kids need structure." When questioned regarding the consequences of defying authority (for example, for reading legal mail or for not attending custodial visitation with Father), Mother had no answer. Mother's household seems to have no rules or punishments.[5] As [Child] is now a teenager and entering high

_____

[5] This appears to be overstatement by the trial court. Child is a straight-A student and is active in the community. There is nothing in the record

*(Footnote Continued Next Page)*

school, Mother will need to provide more structure to ensure that [Child] has the support he needs as he faces the challenges that teens often do. It is [the trial c]ourt's belief that the parties' inability to cooperate and provide a semblance of consistency in parenting [Child] is even more harmful to [Child].

Order, 9/6/2012, at 6-7.

There is a high level of conflict and a seemingly nonexistent level of cooperation between the parties. In actuality, this case ranks as one of the highest conflict cases the [trial court] has ever presided over. The case was originally filed in 2003 and, including the [trial court], there have been seven judges who have presided over this matter.

The parties do not communicate over the telephone, rather they only communicate via text or email. Father restricted Mother's use of his email address and set up a separate account for her use; however, Father testified that he only checks that email address every two to three days. Father also testified that he does not regularly check the *OurFamilyWizard* program, which was ordered as of September 5, 2012. Father seemingly "cherry picks" his issues as he claims he is not told anything but then readily admits he does not consistently track any of the avenues of communication. Mother, on the other hand, assumes that Father should be aware of certain events by virtue of the fact that the event is plugged into the *OurFamilyWizard* calendar. Mother must realize that even if she inputs an event on the calendar during Father's custodial time (without a separate email requesting that Father relinquish his custody time), she must still obtain Father's permission for the event. Merely inputting the event into *OurFamilyWizard* on Father's custodial time does not mean that Father has agreed to the event.

The parties blame each other for the conflict and neither can see his or her contribution to the problems. For example, while Mother complies with the order to communicate and uses

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

related to the instant appeal that suggests that Child has misbehaved, and thus warranted punishment, in any way unrelated to his refusal to spend time with Father.

*OurFamilyWizard*; she uses it to block out Father's time. Father complains that he does not receive information but rarely checks his email or the *OurFamilyWizard calendar*. The parties' lack of communication has caused negative consequences such as misunderstandings with train schedules and ongoing problems with custody schedules.

Findings of Fact, 1/30/2014, at 7.

Factor 16 allows the trial court to expound on any other factor it finds relevant to the determination of Child's best interests. The 2012 order includes no discussion under factor 16. In 2014, the trial court offered the following.

> Mother's major contention has been Father's failure to abide by [the trial c]ourt's orders to comply with therapy. The first order issued by the [trial court], dated April 25, 2012, directed Father and [Child] to attend joint counseling. Pursuant to this order, the parties were to submit the names of counselors and agree on a therapist. The [trial c]ourt agreed to make several concessions to Father (such as scheduling at the end of the day, finding a therapist close to the train and/or allowing Skype sessions) considering the fact that Father was traveling from Virginia. After the counselor was changed (for a variety of reasons), on September 21, 2012, [the trial c]ourt ordered Father and [Child] to commence therapy with Dr. Talia Eisenstein. Unfortunately, the therapy did not commence until late January 2013 and subsequently broke down.[13] From August through September, the [trial court] entered an additional order directing Father to commence counseling. Despite these orders, Father apparently attended only one session in November. However, Father produced several emails from November through January showing several attempts on his part to schedule both in person and Skype sessions with Dr. Eisenstein. A majority of the delays were due to the therapist's travel schedule and lack of availability.

> _____
> [13] Dr. Eisenstein submitted a written report to the [trial court] on April 17, 2013 citing various difficulties with the sessions including Father's unwillingness to travel to Philadelphia for sessions and the ineffectiveness of Skype

sessions. Dr. Eisenstein noted that she did not believe she could effectively provide therapy under the circumstances.

Father testified that he believes the therapy (with Dr. Eisenstein) is being used as a club to interfere [with] and sabotage his custody. He testified that when he tries to discuss issues with [Child], he is told by [Child] that they have to wait to discuss it in therapy. He felt that the therapy was not helpful because it is being used to thwart and delay custody since [the trial c]ourt stressed the need for both father and son to attend. The [trial c]ourt agrees with Father that the therapy (or lack thereof) is being used, to some degree, as an excuse for [Child's] refusal to comply with orders. However, the [trial c]ourt believes that a stringent course of therapy is required for Father to repair the father-son relationship. If Father does not comply with the portion of [the trial c]ourt's order regarding intensive therapy, the [trial c]ourt will consider vacating its order and reinstating the previous order.

Findings of Fact, 1/30/2014, at 8-9.

An examination of the trial court's analysis in light of the record before us, accepting the trial court's factual findings and credibility determinations, leads us to conclude that several of the trial court's conclusions are unreasonable under the circumstances of this case, and ultimately the trial court abused its discretion in awarding Father primary physical custody of Child.

As noted, the facts have not changed much between the 2012 and 2014 orders. Child is still in Mother's primary care, and is thriving in all aspects other than his refusal to spend time with Father. Mother still does not punish Child to the trial court's satisfaction for Child's refusal to go to

Virginia. Father still has not attended more than sporadically the counseling with Child that the trial court has ordered repeatedly,[6] and does not check his email or *OurFamilyWizard* regularly to keep informed about Child's schooling and activities.

From reading the trial court's analysis of the custody factors, what appears to have changed is the trial court's level of exasperation with the failure of Mother and Child[7] to obey its prior custody orders. It appears that

_____

[6] The trial court ordered counseling to begin by order entered in May 2012. Other orders requiring Father to participate in weekly counseling were entered in 2012 and 2013. According to Mother, Father attended exactly two sessions. The testimony is unclear whether this number includes all sessions with all counselors over the entire time counseling was ordered. However, Father admitted to attending only two sessions in the thirteen months prior to the October 2013 hearing. If Father had participated in weekly counseling, he would have attended at least four sessions each month for twenty months.

[7] For example, the trial court had the following exchange with Child.

> [Trial Court]: Here's the problem that I have. I have a child who is just not obeying my orders. And I have worked with you for the last couple of years. I've bent over backwards. I've done everything you wanted me to do. Everything you asked me for, I've done that and I thought you and I had an agreement, kind of a contract, that I was going to give you the safety measures that you needed and you were going to cooperate. And you haven't. You haven't held up your end of the bargain at all. So you tell me what we need to do to make you comply with these orders.
>
> * * *
>
> If you were an adult and you weren't listening to me, some of the things that I could do is I could put you in jail. I don't want to do that.

*(Footnote Continued Next Page)*

vindication of its authority may have motivated, in part, the trial court's decision to place Child with Father. **See, e.g.**, Findings of Fact, 1/30/2014, at 9 ("[The trial court] believe[s] that Father will ensure that [Child] maintains and follows [the trial c]ourt's orders while Mother has not done so as primary custodian.").

The trial court's frustration is certainly understandable. However, to the extent that the trial court's order is based upon Mother's failure to comply with the prior custody orders, we remind the trial court that "a mother's violation of a custody order may be an appropriate foundation for a finding of contempt, but it cannot be the basis for an award of custody." **Clapper v. Harvey**, 716 A.2d 1271, 1275 (Pa. Super. 1998). Rather, such conduct may warrant a change in custody only "[w]hen a custodial parent so obstructs the visits between the child and the non-custodial parent that the best interests of the child are no longer being served…." **English**, 469 A.2d at 273 (quoting **Pamela J.K. v. Roger D.J.**, 419 A.2d 1301, 1309 (Pa. Super. 1980)).

_(Footnote Continued)_ ————————————

> [Child]:     Am I allowed to be put in jail?
>
> [Trial court]:     No. I'm not going to put you in jail. I can assure you, I would never do that to you, okay, but at some point you have to start cooperating with me.

N.T., 10/24/2013, at 147, 150.

Here, Mother pleaded with Child to spend the ordered time with Father. Her error was declining to punish or otherwise coerce Child to go when Child refused. The trial court has the power to sanction Mother for contempt for her culpability in Child's violation of the custody orders. The proper question for custody modification, however, is what custody arrangement serves Child's overall best interests. For the following reasons, we hold that retaining Mother as the primary custodial parent is in Child's best interests.

First, the trial court erred in rejecting completely Child's preference to remain with Mother as not well-reasoned.

> The weight to be accorded a child's preference varies with the age, maturity and intelligence of that child, together with the reasons given for the preference. Moreover, as children grow older, more weight must be given to the preference of the child. As this Court has recently reaffirmed, where the households of both parents were equally suitable, a child's preference to live with one parent could not but tip the evidentiary scale in favor of that parent.

**B.C.S. v. J.A.S.**, 994 A.2d 600, 604 (Pa. Super. 2010) (quoting **Wheeler v. Mazur**, 793 A.2d 929, 937-38 (Pa. Super. 2002)).[8]

_____

[8] It has been said that a child of 16 or 17 is like an elephant - he sleeps wherever he wants. While the "Elephant Rule" is not incontrovertible, courts have to recognize the limitations of their power in determining where older teenagers must reside.

The trial court's conclusion that Child exaggerates incidents with Father is supported by the record.[9] However, Father admitted to such things as yelling at Child so loudly that Child called the police, N.T., 1/14/2014, at 98; asking a police officer who showed up one of the times Child called to arrest Child for assault because he thought having Child arrested was in Child's best interests, N.T., 10/24/2013, at 88; filing petitions to have Child held in contempt and adjudicated delinquent, N.T., 10/24/2013, at 44-45; and threatening to send Child to military school, N.T., 1/14/2014, at 41. Thus, Child is not imagining that there is conflict.

Further, the trial court ignored other reasons Child offered for not wanting to move to Virginia:

> I don't want it to happen because I've always had a life up here, everything I worked for, my family loves me up here, everything, everything I do, my school, my life. And if you just take that away from me and you move me down there, there goes my entire life pretty much. I mean, I [won't] have any friends. My dad, I've never had any type of real environment down there and just to move me down there it's horrible.

N.T., 1/14/2014, at 268.[10] Given that Child is a teenager, preparing to begin his junior year of high school, and he spoke of issues which are not

_____

[9] For example, Child testified that Father "locked [Child] in a room." N.T., 10/24/2013, at 115. Upon further questioning, Child indicated that what Father did was "asked [him] to go to [his] room and he told [him] to stay up there." *Id.*

[10] Child has an expressive language disorder. *See, e.g.*, N.T., 1/14/2014, at 278. Although he wished to read a statement that he had written at the
*(Footnote Continued Next Page)*

only reasonable, but expected for a child his age, his preference deserves consideration.

Next, the trial court strongly emphasized the importance of counselling to repair Father's relationship with Child. It acknowledged that Father and Child "have lost the ability to communicate with each other[.]" N.T., 10/24/2013, at 151. Indeed, it went so far as to conclude that Father was unlikely to repair the relationship "without substantial counseling[.]" Findings of Fact, 1/30/2014, at 6.

Yet, as noted above, *see* note 6, *supra*, Father has spent two years disobeying orders to participate in counseling. He testified in October 2013 that he does not believe that having participated in the ordered counseling would have made any difference to his relationship with Child. *See* N.T., 10/24/2013, at 43; *id.* at 44 (stating that one hour a week is not going to change anything; it would not be any different than no counseling at all). Rather, Father answered "Absolutely" to the question "Do you think that his just coming down to live with you is going to change the entire relationship and things are just going to be wonderful?" *Id.* at 44.[11] The trial court's

_(Footnote Continued)_ ───────────────

suggestion of Dr. Eisenstein, the trial court would not allow it. N.T., 1/14/2014, at 272.

[11] Father also testified that he wants Child to move to Virginia because Child "needs a character example." N.T., 1/14/2014, at 249. Father believes the change of custody is "going to send a message what kind of society we are…." *Id.* at 236. The testimony bears out the trial court's observation

_(Footnote Continued Next Page)_

belief that Father suddenly will comply with orders to attend counseling, and its decision to predicate a change of custody on that belief, is unreasonable given Father's long-standing antipathy.

Similarly, the trial court's conclusion that Father is at this point capable of maintaining a loving and nurturing relationship to meet Child's emotional needs is unsupportable. Father has to develop a loving and nurturing relationship with Child before he can maintain one. Although the factual basis for Child's dislike for spending time with Father may be exaggerated or unwarranted, it is unquestioned that Child is emotionally distraught about his interactions with Father. At times, Father appears to be oblivious to the effect his actions have on Child:

> You know, that night which you speak of that, you know, I raised my voice at him I thought I connected, I got through and, you know, he's going to say, okay, I respect you now, dad. We got our nails done. We ate dinner. I said good night. He would go home and the next thing I know I'm thinking everything is cool and the police are at my house.

N.T., 1/14/2014, at 98. However, Father did not dispute that Child "can't stand" him. *Id.* at 263. Forcing Child to live with Father primarily, without Father having participated in the ordered counseling to work on their communication issues, is almost certain to traumatize Child emotionally.

*(Footnote Continued)* ———————————

that Father and Mother have conflicting parenting ideologies, with Father's focus being on structure and discipline.

The trial court's conclusion as to factor 10 regarding Child's educational needs is also flawed. The trial court found that Child "will flourish in any school setting[.]" Findings of Fact, 1/30/2014, at 9. However, the trial court went on to note that "it will be incumbent upon Mother and Father to work together with the Virginia school system to transfer [Child's] IEP and ensure that a support system is in place when [Child] transfers." *Id.* Hinging the success of Child's education upon Mother and Father being able to cooperate simply cannot be justified in light of the trial court's entirely supportable finding that "[t]here is a high level of conflict and a seemingly nonexistent level of cooperation between the parties." *Id.* at 7.

We are most troubled by the trial court's examination of factor 4 regarding Child's need for stability and continuity. "The stability a child has enjoyed in a long-standing custody arrangement, and the happy relationships a child has developed with a parental figure and others may be decisive factors in a custody decision." *E.A.L. v. L.J.W.*, 662 A.2d 1109, 1117 (Pa. Super. 1995). *See also K.L.H. v. G.D.H.*, 464 A.2d 1368, 1373 (Pa. Super. 1983) ("[T]he continuous residence of children with one parent may be controlling in a custody dispute.").

"In a case which presents the possibility of a change in custody, it is incumbent on the court 'to fully discuss the possible effect on the child of the proposed transfer of custody.'" *E.A.L.*, 662 A.2d at 1117 (quoting *English*

***v. English***, 469 A.2d 270, 273 (Pa. Super. 1983)).  ***See also Masser v.***

***Miller***, 913 A.2d 912, 921 (Pa. Super. 2006) (quoting ***Johns v. Cioci***, 865

A.2d 931, 937 (Pa. Super. 2004)) ("The court must give attention to the

benefits of continuity and stability in custody arrangements and to the

possibility of harm arising from disruption of longstanding patterns of

care.").

In the instant case, there is no discussion by the trial court about the

possibility of harm to Child in uprooting him from the care pattern he has

known his entire life and sending him, against his will, to live with Father.

Even Father acknowledged that moving Child to Virginia at this point "would

be disruptive."  N.T., 1/14/2014, at 249.  That is an understatement, given

that Child would be taken away from his school and his friends his junior

year of high school, and placed in a home that he has spent two years trying

to avoid, or, when he is there, seeking any means of leaving as soon as

possible.

We do not minimize the benefit and importance of Child establishing

and maintaining a healthy relationship with Father.  Nor do we discount the

harm that Mother has allowed to occur by her failure to promote Child's

relationship with Father.  If she does not improve in this regard, a finding of

contempt and sanctions against her could be appropriate.  Nonetheless, with

the drama and trauma that has attended so many of Child's interactions with

Father, and Child's own testimony regarding the devastating effect

transferring primary custody would have at this stage in Child's life, it is manifest that Child's overall best interests are served by living primarily with Mother during the school year. In all respects other than his relationship with Father, Child is thriving in his environment in Pennsylvania. Accordingly, consistent with this memorandum, we remand this case for entry of a new custody order granting primary physical custody to Mother.[12] In the meantime, the provisions of the September 2012 custody order shall apply.

Order vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/11/2014

---

[12] Because we file this memorandum prior to the beginning of the school year, we deny as moot Mother's Emergency Motion for Stay.