J-S38002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TIMOTHY CAMPBELL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JENNIFER CAMPBELL | : | |
| | : | |
| Appellant | : | No. 1548 EDA 2022 |

Appeal from the Order Entered May 20, 2022
In the Court of Common Pleas of Chester County Civil Division at No(s):
2015-03232-CU

BEFORE:  KUNSELMAN, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                **FILED FEBRUARY 6, 2023**

Jennifer Campbell ("Mother"), files this appeal from the order awarding Timothy Campbell ("Father") primary physical custody of the parties' minor children, L.C., T.C., and V.C. (collectively, "Children").  We affirm.

In 2015, Father filed a custody complaint requesting partial physical custody of Children.[1]  The court[2] awarded the parties shared legal custody of their then four minor children.[3]  The court granted Mother primary physical custody, and Father partial physical custody.  ***See*** Order, 6/5/15 ("the 2015

---

[1] L.C. was born in December 2005, T.C. was born in September 2008, and V.C. was born in November 2011.

[2]  Earlier proceedings in this case were conducted before other trial courts. The court from whose order Mother appeals did not become involved in this case until 2022.  ***See*** Trial Court Opinion, 7/20/22, at 2.

[3] E.C., the parties' eldest child, is now emancipated.

order"). At the time of the court's order, Mother and Father both lived in West Chester where Father works and still lives. *See* N.T., 3/29/22, at 16, 70.

Mother bought a home in West Grove, Chester County to which she moved in 2020, retaining primary physical custody of Children. *See* N.T., 3/30/22, at 168. Father filed a petition for primary physical custody of Children and a petition for special relief to prevent Mother from removing Children from the West Chester Area School District. *See* Trial Court Opinion, 7/20/22, at 1-2.

Following a conciliation conference in December 2020, the court entered a temporary order awarding the parties shared legal and physical custody of Children. *See id.* at 2. Mother challenged the ruling, resulting in hearings after which the court awarded Mother primary physical custody and Father partial physical custody during the school year and shared physical custody during the summer, and permitted Children to begin school in the Avon Grove School District. *See* Order, 12/24/20 ("the December 2020 order").

In February 2021, L.C., then sixteen years old, ran away from Mother's home in the middle of the night and called paternal grandmother, who took him to Father's house. *See* N.T., 3/29/22, at 89-92, 189-192; N.T., 3/30/22, at 176-179. After school the next day, Father returned L.C. to Mother's home. *See* N.T., 3/29/22, at 92; N.T., 3/30/22, at 179.

Mother filed a temporary protection from abuse petition ("PFA") that day, alleging that Father had threated to kill her if she retrieved L.C. from his

home. *See* PFA Petition, 2/16/21. Mother also alleged that Father had previously abused her by attempting to intimidate her, backing her against a wall, screaming in her face, and pushing her. *See id*. The court granted a temporary PFA order against Father. *See* Order, 2/16/21.[4]

In March 2021, Mother filed a petition for contempt of the trial court's December 2020 order alleging that Father had threatened to kill her. *See* Petition, 3/3/21. Mother's petition attached text messages between L.C. and Father, which, she averred, showed that Father induced L.C. to run away and spoke negatively about her and her mother. *See id*. The following day, Mother filed a petition to modify custody and suspend Father's physical custody, citing text messages in which Father texted L.C. to "just run away to me they will yell at me not you," "nobody helps us white men anymore," and "women are the root of all evil." *See* Petition, 3/4/21, at 3-4 (unnumbered).

Following an April 2021 custody conciliation conference, the court issued an order suspending Father's physical custody and preventing him from having unsupervised communications or contact with Children until further order of court. The court's order further barred Father from texting, telephoning, FaceTiming or otherwise contacting L.C. "until such time as Father's treating therapist recommends that Father understands the impact of his manipulative, racist, sexist, and destructive behavior on the

---

[4] Mother filed a praecipe to withdraw her PFA petition on April 16, 2021.

impressionable young minds of his children." Order 4/16/21 ("the April 2021 order").

Four months later, Father filed a petition to modify custody, asserting that Mother had stopped taking L.C. to the therapist they had found for him, and that Father had: undertaken therapy, been found not to present a current risk of harm to himself or others, continued to receive treatment, and had not any contact with Children for four months. *See* Father's Petition, 8/25/21, at 2-4. Father sought an order similar to the 2015 order that would permit him to coordinate his partial custody time with his work schedule. *See* Father's Petition, 8/25/21, at 4.

In November 2021, after a conciliation hearing, the court granted Father "therapeutic supervised visitation"[5] one day every other weekend for three hours and directed that L.C. begin therapy. The order stated that "Father shall have no unsupervised communications or contact with [Children] until either the agreement of the parties or further order of court." *See* Order, 11/19/21 ("the November 2021 order"). Father challenged the rulings, and the court scheduled a custody trial.

_____

[5] The Child Custody Act ("the Act"), 23 Pa.C.S.A. §§ 5321-5340, does not provide for an award of therapeutic supervised visitation. *See* 23 Pa.C.S.A. § 5323(a). Rather, the Act provides for "supervised physical custody," 23 Pa.C.S.A. § 5323(a)(5), which is defined as "[c]ustodial time during which an agency or an adult designated by the court or agreed upon by the parties monitors the interaction between the child and the individual with those rights." 23 Pa.C.S.A. § 5322(a). We deem the court's order as a grant of supervised physical custody and refer to it as such.

The trial court conducted a custody trial over multiple days in March and April 2022, at which it heard the testimony of the parties and multiple other witnesses,[6] and also interviewed each child separately *in camera*. The evidence showed that at times Father used inappropriate language towards Mother and spoke inappropriately with and/or around Children about her. **See** N.T., 3/29/22, at 27-30, 81-83, 185-186; N.T., 4/13/22, at 11, 31, 40. The evidence also showed that, Mother spoke negatively about Father in front of at least one child. **See** N.T., 4/13/22 Court Child Interviews ("CCI"), at 11.[7] Father, his treating therapist, Joseph Peter Francisco ("Francisco"), and Dr. Thomas Haworth, Ph.D. ("Dr. Haworth"), who performed a clinical forensic examination of Father, testified that Father acknowledged behaving inappropriately at times during the course of the custody litigation, including making some comments to L.C. inappropriate to his age or mental status. **See** N.T., 3/29/22, at 22-24, 82-83, 123-26, 185-86. Francisco and Dr. Haworth testified that Father had made significant progress in understanding how his previous behavior negatively affected Children, showed openness to learning, and learned appropriate methods to deal with triggering events. **See** N.T., 3/29/22, at 22-24, 82-83, 123-126, 135. Father testified that Mother

---

[6] The witnesses included Father's treating therapist and doctor, two of his work colleagues, his best friend, and paternal grandmother, as well as the couple's emancipated son, E.C.

[7] Other testimony presented on April 13, 2022 appears in a different transcript with the same date.

has ignored or declined his frequent requests to talk to Children, including on Father's Day in 2021. *See* N.T., 3/29/22, at 107-108.

During his *in camera* interview, L.C., then sixteen years old, stated that Mother sometimes drinks and drives. *See* N.T., 4/13/22 (CCI) at 8-9. L.C. said he initially believed this behavior to be normal but became concerned. *See id*. L.C. stated that Mother drinks "a few drinks, pretty much every day" and at least as much on weekends, and that "when she drinks a lot more, she usually gets more short-tempered." *See id*. at 10. L.C. also testified that both parents speak ill of one another: when she is drunk, Mother tells L.C. that Father is a "deadbeat," "manipulative," and "aggressive," and Father has said similar things regarding Mother. *See id*. at 11-12. L.C. said that he ran away in the middle of the night in sleet and rain in February 2021,[8] and walked for three hours due to the extreme stress of living with Mother, who drank a lot and yelled at and confronted him frequently. *See id*. at 12-13. L.C. said that Father joked about him running away, but he did not take Father seriously. *See id*. at 13.

L.C. told the court that he learned in approximately April 2021 that Father had been ordered not to see him, or, as L.C. understood it, text or call. *See id*. at 17-18. He stated that Mother had never told him after November 2021 (when the court modified the April 2021 order) that he could have

---

[8] L.C. described this as "[n]ot my smartest move." *See* N.T., 4/13/22 (CCI) at 13.

supervised contact or communication with Father, and that she did not tell him until one and one-half months before the hearing that he could pick up the phone when Father called. *See id*. L.C. became aware that Father made daily calls to the house. *See id*. L.C. said that Mother never directly prevented Children from speaking with Father, but she never encouraged Children to do so. L.C. told the court that he "felt awkward because I didn't want to ask if I could [speak with Father] and then [have her] say [`]no[']." *See id*. at 18. L.C. said that when Father would call, some days Mother would permit Children to answer, but the majority of times she would ignore the call, hang up on Father, not tell L.C. about the call, or not put him on the phone; as a result, he spoke to Father once per week or less. *See id*. L.C. stated that he preferred to live with Father and return to the West Chester Area School District. *See id*. at 15, 18.

Thirteen-year-old T.C. told the court that he gets along with Father and has good times with him, including on a recent visit, as did his sister, V.C. *See id*. at 35, 41-42. T.C. told the court that when prevented from seeing or speaking to Father in the first half of the past year, "I didn't even know [Father] was calling" because Mother did not tell him. *See id*. at 32, 36. T.C. had only spoken to Father ten or twelve times in the preceding year although he wanted to speak to Father whenever he called. *See id*. at 36. T.C. also stated that he had heard Father say bad things about Mother a few times years ago, but that in T.C.'s experience, it got better over time. *See id*. at

39-40. When asked which parent he would choose to live with, T.C. indicated some uncertainty but declared "probably [Mother]" because "[he didn't] really want to move schools again." *Id*. at 42.

Eleven-year-old V.C. stated that she heard Father say Mother is not a good person. *See* N.T., 4/13/22, at 22, 28. V.C. also testified that she had fun visiting Father on a day in the week prior to the interview with the court. *See id*. at 29. V.C. confirmed that she had seen Mother drink wine at night, and Mother's boyfriend drank beer. *See id*. at 30. V.C. stated that she has spoken with Father when he said negative things about Mother, and he "reacted fine . . . and . . . did stop most of the time" and has now stopped entirely. *See id*. at 31.

Mother asserted that Father encouraged L.C. to run away in February 2021 and had a history of sending abusive messages to her. *See, e.g.*, N.T., 3/29/22, at 9; N.T., 3/30/22, at 84-85. Mother alleged that Father told her he would kill her if she came to retrieve L.C. Father denied saying this, and paternal grandmother, who heard his end of the conversation, testified she did not hear him say that. *See id*. at 92, 192; N.T., 3/30/22, at 178-179.

The trial court also heard testimony about Mother's and her boyfriend's drinking. In June 2021, the office of Child Protective Services ("CPS") received a report, later determined to be unfounded, that Mother drank alcohol and then drove Children, a report Mother believed Father encouraged L.C. to make. *See* N.T., 3/29/22, at 180-184; N.T., 3/31/22, at 7-8; Father's Exhibit

H.  Mother testified that she drinks alcohol most nights, as does her boyfriend.

***See*** N.T., 4/13/22, at 59-60, 65-66.

During the custody trial, the trial court awarded Father supervised physical custody of Children for two hours one night per week.  At the end of the trial, the trial court ordered that Father have supervised physical custody of Children and supervised telephone calls with Children for one-half hour on Tuesday nights, and directed the parties to file briefs regarding the sixteen custody factors set forth in 23 Pa.C.S.A. § 5328(a).  ***See*** N.T., 4/21/22, at 47, 66.[9]

On May 20, 2022, the trial court entered an order and an accompanying memorandum awarding Father primary physical custody of Children.  ***See*** Trial Court Opinion, 7/20/22, at 3.  Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), and the trial court filed a Rule 1925(a) opinion.

On appeal, Mother presents the following questions for our review:

1.    Did the . . . [t]rial [c]ourt abuse its discretion and commit reversible error in awarding primary custody to Father, who had not requested primary custody at any time prior to or during the trial[?]

2.    Did the . . . [t]rial [c]ourt abuse its discretion and commit an error of law in its findings and application of the custody factors which resulted in the custody order issued by the court[?]

---

[9] Father filed a post-trial brief seeking primary custody of Children.

3.    Did the . . . [t]rial [c]ourt abuse its discretion and commit reversible error by including Father's prior conduct in its findings, which were contrary to the findings of fact issued by the court who heard testimony concerning that conduct[?]

Mother's Brief at 9-10.

We review Mother's issues according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa. Super. 2009) (internal citation omitted). On matters concerning the weighing of evidence and the credibility of witnesses, an appellate court accords deference to the trial court. ***See id***; ***see also A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014) (stating that this Court will affirm the decision of the trial court where the evidence of record supports the trial court's conclusions).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon a child's physical, intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902 A.2d 509,

512 (Pa. Super. 2006) (citation omitted). This Court will not interfere with the trial court's consideration of a child's best interests if the court conducts a careful and thorough assessment and properly exercises its discretion. *See R.M.G., Jr.*, 986 A.2d at 1237.

Child custody actions are governed by the Act. Trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Section 5328(a) provides as follows:

**§ 5328. Factors to consider when awarding custody.**

**(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).  A child's preference in a custody case, when based on good reasons, merits careful consideration.  *See E.A.L. v. L.J.W.*, 662 A.2d 1109, 1117-18 (Pa. Super. 1995).  *See also Wheeler v. Mazur*, 793

A.2d 929, 937 (Pa. Super. 2002) (stating that as a child grows older, more weight must be given to his custodial preference).

Pursuant to 23 Pa.C.S.A. § 5323(d), a trial court shall delineate the reasons for its decision on the record in open court or in a written opinion or order. Additionally, section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen section 5328 custody factors prior to the deadline by which a litigant must file a notice of appeal. There is, however, no required amount of detail for the trial court's explanation:

> all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with [s]ection 5323(d).

*A.V.*, 87 A.3d at 823 (internal citations and brackets omitted). After considering the factors set forth in section 5328, the court may award any of the following types of custody if it is in the best interests of the child:

(1)   Shared physical custody.
(2)   Primary physical custody.
(3)   Partial physical custody.
(4)   Sole physical custody.
(5)   Supervised physical custody.
(6)   Shared legal custody.
(7)   Sole legal custody.

23 Pa.C.S.A. § 5323(a).

In her first issue, Mother asserts that the trial court erred in awarding Father primary physical custody when he did not seek that relief prior to, or during, the trial. *See* Mother's Brief at 15-17. Mother contends that "Father's failure to provide notice that a change of custody was at issue is a violation of

[her] due process rights." *See id*. at 17 and 18 (citing *Langendorfer v. Spearman*, 797 A.2d 303 (Pa. Super. 2002)). Mother further argues that trial courts are only required to weigh the sixteen Section 5328(a) custody factors when assessing a petition that requests a change in the *type* of custody. *See* Mother's Brief at 18 (citing *M.O. v. J.T.R.*, 85 A.3d 1058, 1062 (Pa. Super. 2014). Mother contends that because Father's petition requested less time with Children than he had under the 2015 order, *see* Father's Petition, 8/25/21, and did not request primary physical custody until his post-trial brief, she did not present evidence about the effect on such an order on Children. *See* Mother's Brief at 25-26. Mother also asserts, as part of her claim of deficient notice, that Father failed to present evidence that his work schedule would allow him to assume primary custody, or that he has stability in his rented home, and, further, that Children have flourished in her sole care and that Father has misogynistic and racist views that the court should have acted to prevent him from imparting to Children. *See id*. at 21-25.

Mother did not assert a violation of her due process rights at trial, in her concise statement of matters complained of on appeal or her statement of questions involved. The trial court did not address that issue. Mother thus waived review of that assertion. *See* Pa.R.A.P. 302(a) (stating that issues not raised in the trial court are waived and cannot be raised for the first time on appeal); *see also* Pa.R.A.P. 2116 (stating that no questions will be considered "unless it is stated in the statement or questions involved or is

fairly suggested thereby"); ***In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa. Super. 2017) (holding that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.)

*Langendorfer* would not, in any event, support Mother's due process claim. The *Langendorfer* Court found a due process violation when a lower court modified a custody order although the only issue before it was a contempt petition. ***See Langendorfer***, 797 A.2d at 309. Here, by contrast, the parties knew that the five-day trial – which included *in camera* interviews of Children soliciting the custodial preference of the two eldest – centered on Father's petition to modify custody. ***See***, ***e.g.***, N.T., 3/29/22, at 53 (Mother's attorney makes reference to "the [custody] factors"); N.T., 3/30/22, at 132 (trial court states that "I understand there are 16 [custody] factors and the court will consider all of them"); N.T., 3/31/22, at 77 (Mother's counsel asks Mother why she "think[s] it's not in the best interest of the Children to have 50/50 custody now"). When notice of a proceeding adequately advises a party that custody will be in issue, a court may entertain a request to modify a custody order after a hearing in that proceeding. ***See C.A.J. v. D.S.M.***, 136 A.3d 504, 507 (Pa. Super. 2016). Moreover, a court considering custody has all seven options at its disposal, including primary physical custody where that

is in the best interests of the child. 23 Pa.C.S.A. § 5323(a). Accordingly, Mother's due process claim, even if preserved, would not merit relief.[10]

In her second issue, Mother asserts the trial court did not analyze or weigh the factors, but rather "recited [F]ather's complaints, without any reference to [M]other's explanations for her actions or the documentary evidence that supports [M]other's testimony." Mother's Brief at 27. Mother further contends that the trial court's findings regarding the custody factors lack evidentiary support and are unreasonable in light of the evidence presented. *See id*. Mother challenges, *inter alia*, the trial court's weighing of section 5328(a)(1) because she more likely encourages contact between Children and the other party, *see id*. at 28-33; section 5328(a)(7) because Father manipulated L.C.'s custody preference, *see id*. at 33-40, 53-55; section 5328(a)(8) because Father attempted to alienate her from Children,

_____

[10] Mother asserts, citing **M.O.**, that a trial court is only required to weigh the sixteen factors when the petition for modification requests a change in the *type* of custody, *see* Mother's Brief at 18-19 (emphasis added). She asserts that there was no such request here, and therefore the court was only required to consider the best interests of the child. That the trial court awarded Father more custody than he had originally requested does not demonstrate error. The trial court made its ruling in the best interest of the Children. As Mother acknowledges, the best interest of the child is the determinative factor in considering custody. **See** Mother's Brief at 19. **See also** Trial Court Opinion, 7/20/22, at 7 (concluding that the best interests of the child is "[t]he polestar of any child custody dispute").

Mother's additional assertions concerning Father's allegedly bad character do not support her claim that she lacked proper notice and cannot serve as the basis for relief on her first issue.

*see id*. at 33-45, 53-55; section 5328(a)(13) because Father is alienated from her, *see id*. at 52-53; and section 5328(a)(14) because Father falsely accused her of drug and alcohol abuse, *see id*. at 46-47.[11]

The trial court found that custody factors (1), (7), (8), (13), and (14) weighed in Father's favor. *See* Trial Court Memorandum, 5/20/22, at 1-8.[12] Regarding section 5328(a)(1), the parent more likely to encourage contact between Children and the other party, the court found that Father had not discouraged or denied frequent contact between Children and Mother but that "the same may not be said for Mother." Trial Court Memorandum, 5/20/22, at 1. The trial court faulted Mother for not telling Children that Father had attempted to call them in the nearly one year between the April 2021 order and the trial and found "[o]f particular note . . . Father's Day of 2021, when Father requested an opportunity to speak with . . . [Children]. Mother never responded to that request and, in fact, did not respond[] in any way for nearly 20 days." *See id*. at 3. The trial court also credited Father's "acknowledgment

---

[11] Mother also asserts that the court improperly blamed her for difficulties in setting up therapy for L.C., *see* Mother's Brief at 57-58, and faulted her for not having Children vaccinated. *See id*. at 59-60.

[12] A fair review of the trial court's Memorandum shows that it weighed all sixteen factors and determined that factors (2), (3), (4), (5), (6), (9), (10), (11), (12), and (15) carried neutral weight, and that it had no additional information concerning factor (16). *See A.V.*, 87 A.3d at 823 (stating that the court need only articulate its consideration of all of the relevant custody factors without any particular level of detail).

of his transgressions, subsequent treatment, and his significant progress in addressing the issues[] which gave rise to . . . prior problems." *Id*.

Regarding section 5328(a)(7), the well-reasoned preference of the child, the trial court found L.C. to be "bright, mature and well spoken. The [c]ourt also found L.C. to be credible. L.C. expressed a preference to live with Father to get away from the stress placed on him by . . . Mother. . .." *See id*. at 5. Additionally, the court noted that T.C. stated his desire to continue living with Mother because he does not want to change schools again but found T.C.'s affect flat and apparently the product of "resignation rather than enthusiasm." *See id*.

Regarding section 5328(a)(8), the attempts of a parent to turn a child against the other parent, the trial court found on the one hand that both parents had spoken ill of each other in front of Children but emphasized that Father has "acknowledged his conduct in this regard and is taking active measures, by going through therapy and additional work, to resolve how he interacts and speaks about Mother." *See id*. On the other hand, the trial court found that Mother:

> has made every effort to separate Father from . . . Children since April of 2021, failed to respond to Father's request for telephone calls, including Father's Day of 2021, and according to L.C. and T.C., failed to advise them that Father was attempting to call them. In the [c]ourt's view, Mother's conduct created the impression among . . . Children that Father is a bad person from whom they must remain distant.

*See id*. at 6. The trial court amplified this point in its opinion, where it stated:

Mother acknowledged that at no time did Father pose a threat to the safety of . . . Children. This finding was based upon Mother's testimony and her allowing . . . Children to continue to have unsupervised visits with Father from the time of the filing of a PFA by Mother, until issuance of the [April 2021 order]. The [c]ourt found that despite Mother's conclusion that Father was not a threat to the safety of . . . Children, she nonetheless filed a petition and, apparently, presented a case calling for Father to lose all custody/visitation with . . . Children.

Trial Court Opinion, 7/20/22, at 11.[13]

Similarly, regarding section 5328(a)(13), the level of conflict between the parties and the parties' attempts to cooperate, the trial court acknowledged the contentious nature of the parties' relationship and lack of maturity when co-parenting, but again recognized Father for accepting responsibility and pursuing therapeutic assistance while Mother "does not acknowledge any responsibility for the inability to cooperate with Father." **See id**. at 7.

Finally, regarding section 5328(a)(14), the history of drug or alcohol abuse of a party or member of a party's household,[14] the trial court emphasized that Mother testified to drinking most days, and credited L.C.'s testimony that Mother consumed alcohol then drove with Children and that she gets "short-tempered the more she drinks." **See id**.

---

[13] We note that the April 2021 order was not premised on Father's presentation of a physical threat to Children. **See** April 2021 Order. However, the trial court focused on the harmful effect to Children of Mother not telling them that Father had asked to speak with them.

[14] Father offered no evidence that Mother or her boyfriend used illegal drugs.

We conclude that the trial court properly exercised its discretion in awarding Father primary custody of Children. Concerning related factors (1) (8), and (13) which consider a party's attempts to support Children's relationship with the other party and their attempts to cooperate with each other, the record supports the trial court's finding that Father did not impair the parent-child relationship, but Mother did. Both L.C. and T.C. testified that for a period of many months Mother did not tell them that Father had been trying to speak to them on the phone. The court twice noted that Mother did not grant Father's request to speak to Children on Fathers' Day 2021 and did not respond to that request at all for nearly twenty days. *See* Trial Court Memorandum, 5/20/22, at 2, 6. Although the April 2021 order reflected a concern that unsupervised contact with Father threatened to expose Children to the abhorrent views he had expressed and, further, did not require Mother to allow Children to speak to Father, nothing in that order or the subsequent November 2021 order precluded Mother from permitting and supervising calls between Children and Father or, failing that, from telling Children that Father had been calling to speak to them. *See* N.T., 4/13/22 (CCI), at 17-18, 36. Mother had no obligation to allow Children to speak to Father on the phone or have unsupervised contact with him. However, she did not even tell them their Father was calling. Mother's conduct prevented T.C. from knowing that Father had called and, after she belatedly gave them that information, only inconsistently allowed Father to speak to Children, which left L.C. feeling

- 20 -

awkward when he wanted to speak to Father. Mother's discouragement of Children's contact with Father supports the trial court's determination that "Mother's conduct create[d] the impression among . . . Children that Father is a bad person from whom they must remain distant." Trial Court Memorandum, 5/20/22, at 6.

Additionally, Dr. Haworth and Father's treating therapist testified that Father had acknowledged his prior misconduct that had hurt Children and was making significant progress in changing his behavior. *See* N.T., 3/29/22, 22-24, 82-83, 123-26. Father also acknowledged his prior mistakes of sharing his frustrations with Children. *See id*. at 82. By contrast, Mother blamed Father for L.C. running away, *see* N.T. 4/13/22, at 9, and also blamed him for falsely reporting in June 2021 that she drank and drove, *see* N.T., 3/29/22, at 180-84, even though Father had not spoken to Children for two months before the report. *See* N.T., 3/31/22, at 7-8.

Regarding section 5328(a)(7), the well-reasoned preference of the child, the record supports the trial court's characterization of L.C. as "bright, mature, and well-spoken," and finding that L.C. expressed a preference to live with Father rather than Mother in part to avoid her short temper when she drank. Trial Court Memorandum, 5/20/22, at 5. The law supports the trial court's decision to afford great weight to L.C.'s preference. *See Wheeler*, 793 A.2d at 937; *E.A.L.*, 662 A.2d at 1117-18. Further, on a cold record there is no basis to find an abuse of discretion in the trial court's determination that T.C.'s

statement that he did not want to move schools again expressed resignation rather than enthusiasm about living with Mother[15] and that V.C. would fare equally well in either home. **See id**.

Finally, with regard to section 5328(a)(14), which addresses alcohol and drug abuse by a party or a member of the party's household,[16] L.C.'s testimony, T.C.'s testimony, and Mother's own testimony established that Mother drank almost every day as did her boyfriend, and that Mother became more irritable when she drank. No evidence suggested that Father had an alcohol problem. The trial court did not abuse its discretion in weighing this factor in Father's favor. **See** Trial Court Memorandum, 5/20/22, at 7-8.

Mother challenges the trial court's weighing, *inter alia*, of which parent was more likely to encourage contact between Children and the other party, and her assertions that Father manipulated L.C., attempted to alienate Mother from Children and falsely accused Mother of drug and alcohol abuse. This Court will not disturb a trial court's findings of fact and determinations regarding credibility and weight of the evidence absent an abuse of discretion. **See R.M.G., Jr.** 986 A.2d at 1237; **A.V.**, 87 A.3d at 820. We are not permitted "to determine whether the trial court reached the 'right' decision;

---

[15] **See McMillen v. McMillen**, 602 A.2d 845, 847 (Pa. 1992) (asserting that to merit consideration a child's custody preference must be based upon good reasons).

[16] Father presented no evidence of Mother's or her boyfriend's drug use.

rather, we . . . consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion in awarding custody to the prevailing party." ***King v. King***, 889 A.2d 630, at 632 (Pa. Super. 2005) (internal citations omitted). In light of our standards of review, we cannot agree with Mother that the trial court abused its discretion in weighing the evidence.

In her third and final issue on appeal, Mother asserts that the trial court must have disregarded section 5328(a)(10), the daily needs of the child, regarding V.C.'s former peanut allergy, ***see*** Mother's Brief at 60, a factor Father admits a prior court weighed in Mother's favor. ***See*** Father's Brief at 22. Regarding this factor, Mother asserts that the trial court "failed to give due weight to the factual findings of the trial court who issued her opinion less than two months before L.C. ran away." ***Id***. at 62.[17] Mother emphasizes that "all themes addressed in the previous trial are repeated here." Mother's Brief at 63. Mother appears to be asking this Court to reweigh the evidence from this trial in light of the evidence at a prior trial. She may not have such review. ***See M.J.M. v. M.L.G.***, 63 A.3d 331, 339 (Pa. Super. 2013) (stating that it is within the trial court's discretion to determine which factors are most salient).

---

[17] The trial court precluded the admission of evidence relating to previously-litigated claims and conduct prior to its December 23, 2020 order. ***See*** Order, 3/7/22.

Upon review of the testimonial and documentary evidence, the trial court's memorandum, and its Rule 1925(a) opinion, and mindful of our scope and standard of review, we conclude that the trial court carefully and thoroughly considered Children's best interests, and its award of primary physical custody to Father constituted a proper exercise of discretion. Accordingly, we affirm the order.

Order affirmed.

Judge Murray joins this memorandum.

Judge Kunselman Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/6/2023